## REA *v.* MISSOURI.

1. Although a greater latitude is allowable in the cross-examination of a party who places himself on the stand, than in that of other witnesses, still, where the cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court in the exercise of a sound discretion; and the exercise of that discretion is not reviewable on a writ of error.

2. Where A. had levied on certain goods as owned by B., which C. claimed, the allegation of A. being that there had been collusion between B. and C , and that C. was a mere instrument of B., *held* on a suit by C. against A. for damages—(the jury having been charged by the circuit judge in a way not excepted to, and coming in for additional instructions and being again charged by the district judge, who now happened to be on the bench)—

1st. That where the manifest tendency of the additional instructions, contrary to that of the original charge, was to give the jury the impression that evidence was required of a character more direct and positive than that of facts and circumstances tending to the conclusion of fraud, and such as might reasonably induce the jury to believe that C. held the property but in trust for B., the additional instructions were erroneous. And further, that it would not be inferred by this court that the jury had taken them in connection with the qualifications made in the original charge.

2d. That any statements made by B. in the absence of C., which were afterwards assented to by the latter or were part of the *res gestœ*, were evidence in the suit.

3d. That an intimate personal and business relation between B. and C. having been shown, it was error to instruct the jury that it was immaterial as to the ownership of the goods how C. acquired his means, or whether his exhibit of them was correct or not.

ERROR to the Circuit Court for the District of Missouri; the case being thus:

The First National Bank of Washington, D. C., in 1869, having a judgment against one Perry Fuller, who had been a large dealer with the Indians on the Western frontier, having more than one trading-place there, levied on certain goods at St. Louis, in Missouri, which they alleged to be his. One Hayes, however, claimed them; and the sheriff refusing to go on with his levy unless indemnified, the bank, along with Rea and another, in accordance with a statute of Missouri, executed a bond to the State of Missouri, conditioned that the bank should indemnify the sheriff against the seizure of the goods, and should also pay Hayes, and any person claiming title to the property, for all damages which they should sustain in consequence of such seizure and sale.

The sheriff hereupon sold the goods under the attachment, and thereupon an action was brought in the name of the State of Missouri on the relation and to the use of Hayes against the sureties in the bond, Rea, and the other; the suit, of course, being in fact, one by Hayes, for an illegal seizure and sale of his goods.

The bank set up that the goods belonged to Fuller, and that the purchase of them by Hayes was a simulated and fraudulent one, and was in truth made for the benefit of Fuller.

The great question on the trial was whether there was or was not a fraudulent scheme between the two persons, by which the goods in question were to be purchased in Hayes's name, but in secret trust for the use and benefit of Fuller, wholly or in part.

In the course of the trial Hayes, the virtual plaintiff, was placed on the stand, by his own counsel, to show the value

of the goods in question, and the fact that he had purchased them on his own account alone. His cross-examination was very long, covering fifty pages of the printed record, and took a wide range. It appeared on this cross-examination that in 1865 he had been a clerk in the Indian Department at a salary of $1500, and had a wife and child, and that these goods were bought in 1869, and had cost about $24,000, being bought partly for cash *and partly on credit.* To explain his ability to make a purchase, in either way, on so considerable a scale, the witness having stated that in 1865—some four years before the goods were bought—he was worth $45,000, he was asked how he had acquired that sum. As to a portion of it he stated that he had advanced money,—sometimes $3000 or $4000, and from that to $6500 at a time,—to a third person to buy up government vouchers on speculation; and that he and this person had shared, share and share alike in the profit.

The record then disclosed the following dialogue:

*Counsel for the defendants (to the witness):*

*Question.* To whom did you lend this money to buy Indian vouchers?

*Answer.* To a friend of mine.

*Question.* Who was it?

*Answer.* If the court requires I shall tell the name, not without.

*Question.* You decline to answer?

*Answer.* If the court requires it, I will answer.

*The Court.* If there is some reason why he does not wish to disclose the name, the court will not oblige him to do it.

*Counsel for the defendants.* The witness might answer the questions; they are very short.

*The Court.* He may have personal reasons why he does not choose to name the parties; if so, I won't press him.

*Counsel for the plaintiff.* Suppose the man was an officer of the government, and made himself criminally liable?

*Counsel for the defendants.* Then let the witness state it.

*The Court.* If there are personal reasons why the witness does not choose to answer, he need not state it.

*Witness.* I prefer not to give it.

And thereupon, no answer being given, an exception was noted.

Hayes also stated in his cross-examination, that Fuller & Co. and McDonald & Fuller, firms dealing with the Indians, and in which Perry Fuller was interested, were indebted to him for services rendered to them in certain contracts which they had with the government in 1866, and that they had paid him large amounts on that account, a matter which the defendants denied to be true.

. The goods had been purchased at New York by Hayes, and the bills made and the goods shipped to St. Louis in his name alone.

A great mass of evidence of a circumstantial character was taken on the subject, showing the history and character of the connection between Hayes and Fuller; and as the defendants contended, tending to prove that Hayes was a mere tool of Fuller's, in this as well as other transactions. It was shown that Hayes had been in intimate relations with Fuller previously to this purchase; that Fuller, though a dealer with the Indians, and in the West, was much in Washington, and that Hayes, as already said, was a clerk in the Indian Department in that city, and that the two persons were acquainted in this manner in 1861; that Fuller being afterwards, 1868, appointed revenue collector at New Orleans, Hayes was appointed an appraiser under him, with a salary of $1800; that in the matter of the purchase of the goods levied on, Fuller recommended Hayes as a purchaser of them, certified to his responsibility, indorsed his notes for a part of the purchase-money, and pledged his wife's securities as collateral to a portion thereof. A great variety of other evidence of many kinds was given tending, as the counsel of the defendants conceived, to show intimacy and collusion. Amongst this evidence were various declarations of both Hayes and Fuller, made at different times, as well when they were together as when they were not.

The testimony being closed the circuit judge charged the jury thus:

"If you find from the evidence that Hayes was the sole

owner of the goods, and that Fuller had no interest or right of property therein, then the bank had no right to levy its attachment upon them, and the defendants are liable to the plaintiffs for their damages.

"But if you find that Fuller owned the property attached, or was a copartner, though a secret copartner with Hayes in respect to said goods, or had a joint interest in them, then, in either case, the bank had a right to attach the goods, and the defendants are not liable in this action; and in this action are not liable although Hayes, as between himself and Fuller, may have had a joint interest, with Fuller, in the goods."

After stating that the goods were purchased in New York in the name of Hayes, and that the bills were made to him, and that *primâ facie*, therefore, the goods would be Hayes's, the learned judge added:

"But the bank asserts that, although the goods were thus purchased ostensibly or apparently in the name of Hayes, yet that the purchase was in pursuance of a secret agreement or understanding between Hayes and Fuller, to the effect that Hayes should buy, in his own name, but for Fuller's benefit and use, or for the joint use and benefit of Hayes and Fuller, and that the motive or inducement for this arrangement or understanding was that Fuller was in embarrassed circumstances, or was apprehensive of trouble if his name was known in the purchase. In other words, the bank alleges that there was a fraudulent scheme between Fuller and Hayes, by which goods were to be purchased in Hayes's name, but in secret trust for the use and benefit of Fuller wholly or in part."

The learned judge then told the jury that the alleged fraudulent scheme might be established by circumstances; that it was not necessary to establish it by express or positive testimony; and after other pertinent remarks, not now material to be stated, the case was submitted.

The jury having remained out until the next morning failed to agree, and returned into court, when they were again charged by the district judge, then holding a Circuit Court, as follows:

["If the property in question was bought and shipped solely

in the name of Hayes, then the jury should find the ownership
to be exclusively his, unless the defendants have proved that
notwithstanding such purchase and shipment, the fact really is
that the ostensible and apparent ownership of Hayes was to
cover up and conceal a *proprietary* interest of Fuller in the
goods.   In other words, the possession of the goods by Hayes,
the same having been bought and shipped solely in his name,
throws upon the defendants the burden of proving that Fuller
had a *property* interest therein, or was part owner thereof.]

[" The defendants, in proving a secret or other agreement or
understanding between Hayes and Fuller *as to ownership of these
goods,* must first establish that fact by competent evidence, in-
dependent of any declarations or statements by Fuller in the
absence of Hayes.]

[" In order to prove such understanding, the defendants can-
not resort to such declarations or statements by Fuller; hence,
discarding from your minds on that branch of the inquiry all
statements made by Fuller in the absence of Hayes, you should
first determine whether such an understanding existed.   If it
did not exist, or is not proved by testimony independent of such
statements by Fuller, then the jury cannot consider such state-
ments by Fuller as any evidence whatever in this case.   If satis-
fied by such independent evidence that such an understanding
existed, then Fuller's declarations are competent testimony, and
not otherwise.]

[" It is immaterial as to the *ownership of the goods* how Hayes
acquired his means, or whether his exhibit of his means was
correct or not, if he actually bought the goods solely for him-
self.   The merchants of whom he bought, if the purchase was
based on false representations, had their legal redress, but the
defendants cannot impair the title on such grounds;] that testi-
mony it is proper for the jury to consider in reference to the
credibility of Hayes as a witness, and also as tending to show
what connection, if any, Hayes had at the time with Fuller, and
so with respect to the manner in which he acquired his means
or credit.

[" If he wronged the government, or violated his official obli-
gations, or procured an unfair advantage in his settlement with
Fuller & Co. or McDonald & Fuller, this is not the case in which
he is to be tried for such alleged misconduct.   This is a simple
question *as to the ownership of the goods in controversy,* and not as

to other or outside questions, and such questions have nothing to do with the merits of this case further than they affect the credibility of witnesses, or throw light upon the alleged under-standing between Hayes and Fuller *as to their ownership of this property.*"]

After this last charge the jury brought in a verdict of $23,127; and judgment being entered accordingly, the de-fendant brought the case here on an exception to the ruling as to Hayes's refusal to answer, and on exceptions to different parts, put above in brackets, including, in all, almost every part of the charge as last above given. No exception was taken to the charge of the circuit judge; on the contrary, it was admitted to be proper.

*Messrs. J. B. Henderson and A. F. Smith, for the plaintiff in error :*

1. *As to the refusal of the court to make Hayes name the third person, styled his friend ; the exception to the ruling of the court on the admission of evidence.*

Whether or not Hayes did own $40,000 when he bought these goods was a question of capital importance in the case. If he did, HE might well have bought them. If he did not, and owned nothing, HE could not have bought them at all; and this, his inability to buy them, taken in connection with the intimate relation, both generally and in this particular transaction, shown with Fuller, made patent the collusion and fraud which was set up and charged by the bank, and which was the *gist* of the case. The matter which it was sought by the question to prove went, therefore, directly to the foundation of the case. There was nothing irrelevant or even collateral in it.

Moreover, the question put was one invited, by what the witness himself had shown, to wit, that he had been but an inferior clerk—one at $1500 a year—and had a wife and child with himself to provide for. How then did he, during that time, come to get $40,000 ?

Our purpose in the question was obvious. We wished Hayes to name his alleged friend, that we might call that

" friend " and show by him that Hayes's statement was false, and that Hayes had never made anything in the way alleged. The witness, it will be observed, did not set up as a ground for his refusal that a disclosure of his alleged friend's name would criminate either the friend or himself. He simply declined to name him; and the court sustained the witness.

Now, while it is no doubt true, that when a witness is under cross-examination and the object of counsel is merely to test his accuracy, or his memory, or to impeach him by an exposure of his transactions outside of the case on trial, the whole control of the cross-examination rests with the judge who presides, and that the judge may either restrict the counsel or may throw the door wide open—the only limits being that the witness shall not be required to give evidence tending to prove himself guilty of a crime, and that he shall not be required to expose himself to a penalty or forfeiture—yet when the evidence in question is principal evidence, and is not collateral or irrelevant to the issue, the witness will not be excused from answering. And this is true even if it appear that the answer will tend to degrade him;* a matter which, as we have said, was not here alleged.

Further. A witness having voluntarily and without objection testified to part of a transaction in such a manner as favorably to affect the case of one side, cannot afterwards object to tell the remainder of the story, when such remainder might afford an explanation or an answer to the part already told. And this is again true, even though telling the remainder will tend to convict the witness of a crime.†

---

* 1 Greenleaf on Evidence, § 454; 2 Phillips on Evidence, 939 (ed. of 1859), also note 593; Swift on Evidence, 80, 81; The People v. Abbot, 19 Wendell, 192–195; Great Western Turnpike Company v. Loomis, 32 New York, 127, 137; The People v. Lohman, 2 Barbour, 224–5; Lohman v. The People, 1 Comstock, 379–385; In re Lewis, 39 Howard's Practice Reports, 155; Hill v. State, 4 Indiana, 112; Weldon v. Burch, 12 Illinois, 374; Clementine v. State, 14 Missouri, 112; State v. Douglass, 1 Id. 527; Ward v. State, 2 Id. 120; Ginn v. The Commonwealth, 5 Littell, 300; Clark v. Reese, 35 California, 89.

† Roberts v. Garen, 1 Scammon, 396; Pitcher v. The People, 16 Michigan,

2. *As to the additional instructions:* While the first charge properly left to the jury the real question in the case—namely, whether the goods bought by Hayes in his own name were bought upon some secret trust for the benefit of Fuller—the additional instructions, or new charge, as it really was and might be better called, was calculated to lead the jury to throw out of account every consideration but the one, who bought the goods, and to give no weight to the facts, which tended to prove that there was a secret trust for Fuller.

The additional instructions or new charge, moreover, gave an unusual and a prejudicial prominence to the consideration that if Hayes wronged the government, or violated his official obligations, or procured an unfair advantage in his settlement with Fuller & Co., or McDonald & Fuller, this was not the case in which he was to be tried for such alleged misconduct, especially when the judge added, " This is a simple question as to the *ownership of the goods in controversy,* and not as to other or outside questions."

This was almost like directing a verdict for the plaintiffs.

Besides this, the additional instructions or new charge left out of view the consideration that the jury should consider the fact whether Hayes had the means to buy these goods and undertake this business, and that if he had not, the jury might properly infer that the business was Fuller's, and that Hayes was his secret agent.

The effect of the additional instructions or new charge, as a whole, was to obliterate what the circuit judge had said in the first charge.

*Mr. J. O. Broadhead, contra:*

1. *As to the refusal of the court to make Hayes disclose the name of the third person, referred to as his friend; the exception to the ruling of the court on the evidence.*

142; Woburn *v.* Henshaw, 101 Massachusetts, 193; Crittenden *v.* Strother, 2 Cranch's Circuit Court, 464; Chamberlain *v.* Wilson, 12 Vermont, 491; State *v.* K——, 4 New Hampshire, 562; Foster *v.* Pierce, 11 Cushing, 437; Commonwealth *v.* Price, 10 Gray, 472, 476; McGarry *v.* The People, 2 Lansing, 227; Low *v.* Mitchell, 18 Maine, 374; Coburn *v.* Odell, 10 Foster, 540.

The examination in chief has no reference to this subject. Could not the other side, if desiring testimony *de novo*, have called the witness ?*

But, under any circumstances, can a witness be compelled to state a fact in order that the other side may contradict him? Moreover, an answer, if one had been given—and even if the information given by it had been followed out—that is to say, if the friend had been named, and even if that friend had said that he had never had any transactions with Hayes —would not have been relevant to the matter in issue :

1st. Because all transactions alleged with the friend were in 1866, more than three years before the purchase of these goods.

2d. Because the witness did not say that he had paid cash for the goods. On the contrary, it is part of the case that he did not pay cash for them, but that he bought them largely on credit. A man who buys largely on credit rarely has cash. Here the goods cost but about $24,000, and even that sum was not paid in cash. Nor indeed does it appear whether it has ever yet been paid at all.

Moreover, the matter whether the witness should answer rested with the judge. He did give a vast latitude to the cross-examination. He had a right to say where it should stop.†

2. *As to the additional instructions :* These were but suppletory to the charge, which is admitted by the opposite side to have been right, and which still remained the principal and fundamental exposition of principles applicable to the case, and must have been so regarded by the jury.

The whole of the new instructions, when analyzed and abbreviated, is this :

1st. That if Hayes bought and shipped the goods in his own name, then *primâ facie* they are his, and the burden of proving a property interest in Fuller is on the defendants.

2d. That the alleged secret understanding between Hayes

---

* The Philadelphia and Trenton Railroad *v.* Stimpson, 14 Peters, 461.

† Ib. 463.

and Fuller, as to the ownership of the goods, cannot be established by the declarations of Fuller, made in the absence of Hayes, but that such declarations are competent against Hayes after the secret understanding is established by other testimony to the satisfaction of the jury.

3d. That the testimony as to how Hayes acquired his means, whether his exhibit to the merchants of his means was correct or not, whether he took an unfair advantage in his settlements with Fuller & Co., or McDonald & Fuller, is immaterial as to the ownership of the goods, but competent and proper to be considered by the jury as affecting the credibility of Hayes, and as tending to show what connection there was between Hayes and Fuller at the time of the transactions to which this testimony is directed.

What is there in any one of these charges that does not embrace a correct proposition of law?

Mr. Justice BRADLEY delivered the opinion of the court.

1. *As to the exception to the ruling of the court on the admission of evidence in the case.* The cross-examination of Hayes was very long, and took a wide range: much wider than is allowed in United States courts in the case of an ordinary witness, where the cross-examination is usually confined within the scope of the direct examination.* But a greater latitude is undoubtedly allowable in the cross-examination of a party who places himself on the stand than in that of other witnesses. Still, where the cross-examination is directed to matters not inquired about in the principal examination, its course and extent is very largely subject to the control of the court in the exercise of a sound discretion; and the exercise of that discretion is not reviewable on a writ of error. That was precisely the case here. The witness, on his cross-examination, having stated that he was worth $45,000 at a period some four years prior to the purchase of the goods, was asked how he had acquired that

---

* Johnston *v.* Jones et al., 1 Black, 216; Teese et al. *v.* Huntingdon et al., 23 Howard, 2.

sum.   As to a portion of it he stated that he had advanced money to a friend to buy up government vouchers on speculation upon shares.   Being asked to name this friend, he declined; and the court refused to compel him to disclose it. This refusal was excepted to.   We think it was entirely in the discretion of the court to compel an answer or not.   It was on a new matter first introduced on the cross-examination, and was in fact a cross-examination upon a cross-examination.   If a court did not possess discretionary power to control such a course of examination, trials might be rendered interminable.

2.  *As to the exception to the additional instructions of the court.* This presents a more serious question; and an examination of them leads us to the conviction that, taken as a whole, they were calculated to mislead the jury as to the character of the evidence necessary to make out the charge of fraud and to prove the issue on the part of the defendants.

To establish fraud, it is not necessary to prove it by direct and positive evidence.   Circumstantial evidence is not only sufficient, but in most cases it is the only proof that can be adduced.   It was not necessary in this case, for the defendants, in order to maintain the issue on their part, to prove by direct and positive evidence, that Fuller had a secret trust or property in the goods.   It was sufficient if they proved such facts and circumstances tending to that conclusion as might reasonably induce the jury to believe that he had such trust or property.   The sufficiency of such circumstantial evidence was not, in our judgment, properly presented to the jury; but, on the contrary, the manifest tendency of the charge was to give them the impression that evidence of a more positive and direct character was required.   The court said: " The possession of the goods by Hayes, the same having been bought and shipped solely in his name, throws upon the defendant the burden of proving that Fuller had a property interest therein, or was part owner thereof."   Whilst this may have been strictly true in a sense in which it might be understood by an educated lawyer, it did not express the whole truth in a form likely

to be understood by the jury in such a complicated case as the one before them. " Property interest" and " ownership" are words of precise legal signification, and the jury might readily conclude that an interest or trust in the goods, by which Fuller was to receive or to participate in the profits, was not such property or ownership. And yet such an interest or trust would have been sufficient to sustain the charge made by the defendants, and to entitle them to a verdict.

The passage quoted is but one of several expressions contained in the charge, all tending to give the impression that a technical ownership or property in Fuller was necessary to be proved, in order to sustain the validity of the seizure of the goods under the attachment. A further specification is unnecessary.

It may be urged that the qualifications made in the original charge given to the jury before they were sent out, rendered further qualification unnecessary in the final charge now under consideration. On the contrary, it is a more just inference to suppose that the final charge was regarded by the jury as explanatory and corrective of the first. And as the point on which they were likely to have had difficulty and difference of opinion, would be the sufficiency of the circumstances proved, to make out the case of the defendants, a charge like that which was finally given, coming after their fruitless discussion, ignoring altogether the force of circumstantial evidence, and reiterating that the only issue was property or no property in Fuller, must have had a strong tendency to lead them to an entire disregard of such evidence.

We also think the judge erred in laying it down so absolutely as he did, that the defendants in proving a secret or other agreement or understanding between Hayes and Fuller as to the ownership of the goods, must first establish that fact independent of any declarations or statements by Fuller in the absence of Hayes. Any statements made by Fuller in the absence of Hayes, which were afterwards assented to by the latter, or which were a-part of the *res gestæ* of the

purchase of the goods, were competent evidence. For example, the statement of Fuller when commending Hayes to the vendors of the goods, that he was worth forty or fifty thousand dollars, if shown to be untrue, was very material evidence.

We also think the judge erred in instructing the jury that it was immaterial as to the ownership of the goods, how Hayes acquired his means, or whether his exhibit of his means was correct or not. Considering the connection between Hayes and Fuller, the fact that Fuller recommended Hayes as a purchaser of the goods, certified to his responsibility, indorsed his notes for a part of the purchase-money, and pledged his wife's securities as collateral to a portion thereof, an inquiry into Hayes's means at the time of the purchase, and the correctness of his exhibit, was competent and proper. The opposite idea proceeded from the view of the case before noticed, to wit, that the only legitimate inquiry was, as to the naked property of the goods. Whereas, the case really turned upon the ancillary question, whether Hayes and Fuller were engaged in a fraudulent scheme to procure goods in the name of Hayes, but for the secret benefit of Fuller.

JUDGMENT REVERSED, and a

VENIRE DE NOVO ORDERED.

Mr. Justice CLIFFORD dissented, on the first point, the exception to the ruling of the court on the admission of evidence.