**HYLAND v. MILLERS NAT. INS. CO. et al.**
No. 2734.

District Court, N. D. California, S. D.
April 14, 1932.

1004

a stock of merchandise. Plaintiff is a dealer in burlap, and is a manufacturer of burlap bags, liners, etc. A fire occurred in his factory on Sacramento street, San Francisco, on October 19, 1929, resulting in damage to his stock of merchandise, which consisted of manufactured bags, particularly burlap bags and cotton liners, bags in process of manufacture, and materials to be used in manufacture. The policies in suit all cover damage to the stock, and are in the total sum of $185,000. Five policies which total $50,000 are combination specific and excess insurance; one is for $50,000, and is to attach when values are in excess of $50,000; the last group consists of two cover notes written by the National Liberty for $85,000, which call for policies according to the standard statutory form, but which this defendant by a cross-complaint asks to have reformed into excess policies to attach when values exceed $100,000. In addition to this insurance, plaintiff carried $96,000 on furniture, fixtures, and equipment, and $120,000 on use and occupancy, a total of $401,000 insurance. All defendants plead certain special defenses which may be grouped under two heads: First, that plaintiff swore falsely as to his knowledge and belief as to the origin of the fire; and, second, that plaintiff was guilty of fraud and false swearing in connection with his proofs of loss and claims of loss in the pleadings in this action. The five companies writing the first $50,000 of insurance pleaded the additional defense that an appraisement of the loss was not had under the terms of the policy due to the acts of plaintiff. The Western pleads the additional defense that its policy is for damage in excess of $50,000, and that the loss was less than that amount. The National Liberty, in accordance with its prayer for reformation, pleads that it is only liable if values were in excess of $100,000 and for damages in excess of $100,000.

Gavin McNab, Schmulowitz, Wyman, Aikins & Brune, and Shortridge & McInerney, and George B. Harris, all of San Francisco, Cal., for plaintiff.

Redman, Alexander & Bacon and R. P. Wisecarver, all of San Francisco, Cal., for defendants Millers Nat. Ins. Co., Dubuque Fire & Marine Ins. Co., National Reserve Ins. Co., and Merchants' Fire Ins. Co.

Percy V. Long and Bert W. Levit, and R. P. Wisecarver, all of San Francisco, Cal., for defendant Firemen's Ins. Co., of Newark, N. J.

Miller & Thornton, of San Francisco, Cal., for defendant Western Ins. Co., of America.

Orrick, Palmer & Dahlquist, of San Francisco, Cal., for defendant National Liberty Ins. Co.

KERRIGAN, District Judge.

This is a suit in equity to ascertain and apportion the liability of the several defendant insurance companies upon a fire loss to

■ Considering the first defense, the evidence clearly shows that this was a "set" fire and that plaintiff knew it when making his proof of loss. The fire occurred on Saturday evening, October 19, 1929. It had reached sufficient proportions to be detected and the alarm rung by 10:36 o'clock. Plaintiff and his manager of the factory, Miss Mitchell, were the only ones in the factory in the late afternoon; they were there continuously until they left at about 6:30, except for an hour between 4 and 5 when plaintiff went for a walk because of a headache. After Miss Mitchell had gone through the factory locking the windows, they locked the factory and went to their homes. Plaintiff was informed of

the fire by phone, notified Miss Mitchell, and returned with her to the factory about 11 p. m. The fire lasted but a short time after the alarm was responded to, according to the fire department officials in charge of extinguishing it. The following morning plaintiff returned to the factory, as did the representatives of the fire department, the police department, and fire patrol. Because the fire had apparently started in several different places, and because of a pervading smell of kerosene, the fire patrol and the police department were investigating a charge of incendiarism. Plaintiff was advised of this, and asked who might have set the fire. He suggested three discharged employees who might have grievances against him. His attention was directed to the various suspicious circumstances apparent after the fire which I shall mention.

The witnesses testifying to the circumstances surrounding the fire are of two groups; the chiefs of the fire department in charge of fighting the fire and the men in charge of the fire patrol. Plaintiff has vigorously attacked the credibility of the latter witnesses on the ground of bias and interest. Their positions are created by law, but their salaries are paid by the Underwriters' Fire Patrol of San Francisco. It is their duty to keep down loss by protecting stocks of goods from water damage and to investigate fires which are apparently of incendiary origin. The testimony of these men has, on so many material points, been corroborated by the fire chiefs, who are entirely disinterested witnesses, that I do not believe that their credibility has been shaken. The circumstances testified to show that there were four separate and distinct fires. In all but one there was evidence that kerosene had been used to start them. One fire originated on the first floor in back of the office and spread to the mezzanine. The fire started in a pile of burlap bags which had been soaked in kerosene. The kerosene had seeped through the floor and had soaked into bales of burlap directly under this in the basement. The principal fire was in the stair well and started on the second floor. This fire was entirely separate from the one just described. It was some thirty feet away, and the door leading from the first floor to the stair well had been closed. There was no burning between. The type and depth of the burning of wood in the stair well indicated that it was a "flash" fire or gas fire such as would result from the burning of the volatile gas kerosene gives off. The stair well showed little or no evidence of burning between the first and second floors.

On the second floor just outside the stair well, near the open door leading to it, was a shallow pan of kerosene with cut pieces of burlap soaked in it. Another pan of kerosene was found on the same floor about sixteen feet away. There was another fire on the second floor in some bales of burlap across the room from the stair well fire. Its origin was unexplained, and there was no burning between the fires. On the third floor apparently another fire had been started near the stair well. There was a drum of kerosene in which a hole had been punctured near the bottom standing by the door to the stair well. Some oil seeped out, but, as the cap had not been removed from the top, it did not flow freely and became "air bound." On this same floor there was another drum of kerosene on its side, with several holes punctured about three inches from the floor. The kerosene had saturated the floor nearby for a distance of four or five feet. The fire did not reach this location. The fire in the stair well burned up into the fourth floor, where it mushroomed to the ceiling and burned through to the roof. Significantly, the pans filled with kerosene and rags did not belong where they were found, but belonged under certain machinery, and the drums of kerosene had been dragged up from the basement. That the incendiarist was an amateur was shown by his leaving the caps on the drums and by his failing to open the windows and thus feed the fire with the necessary oxygen.

What might be deemed a further suspicious circumstance is the total amount of insurance carried upon the stock of merchandise. I find that the value of the stock at the time of the fire was approximately $88,000; yet, according to plaintiff's own theory of the insurance involved in this suit, he carried insurance on the stock amounting to $185,000. I am unable to say from the record in this case that the insurance on equipment and use and occupancy was excessive as was argued.

It is not an issue in the case, nor is it claimed by defendants that plaintiff set the fire or had guilty knowledge of the incendiarism. The evidence was introduced to establish that plaintiff knew that the fire was of incendiary origin when he swore to the proofs of loss. The policy required the assured to state in the proof of loss his knowledge and belief as to the origin of the fire. Plaintiff stated therein that the origin of the fire was unknown to him. Since the evidence of incendiarism was equally well known to both plaintiff and defendants, and plaintiff knew

that, there was no deception accomplished and perhaps none intended. I do not believe that this defense would alone justify a denial of recovery to plaintiff.

■ I have gone into this evidence thus in detail because the suspicious circumstances surrounding the fire may be considered in connection with the defense of fraud and false swearing as to values where the estimate of value in the claim of loss is grossly excessive. Orenstein v. Star Insurance Company, 10 F.(2d) 754, 757 (C. C. A. 4).

The principal defense relied upon by all of the defendants is that plaintiff was guilty of fraud and false swearing in making his claim as to the extent of his loss. The statutory standard form of fire insurance policy in California provides that "this entire policy shall be void—(b) in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after the loss." It is set up in separate defenses that there was fraud and false swearing, first, in making proof of loss in the sum of $73,601.-96; second, in claiming loss in the sum of $76,498.62 in the original complaint in this action; and, third, in claiming loss in the sum of $106,992.83 in the amended complaint. Finally it is claimed in the argument that plaintiff's right to recover is further barred by his false swearing during the trial of this case. The claims pleaded in the three defenses are all under oath and will be discussed together.

■ It is true, as contended by counsel for plaintiff, that an overvaluation resulting from a mere mistake or error of judgment will not defeat recovery. Atlas Assurance Co. v. Hurst (C. C. A.) 11 F.(2d) 250; Orenstein v. Star Insurance Co., supra. The evidence in this case shows that the overvaluation resulted from no such inadvertence but from an intentionally fraudulent attempt to get an excessive award from the insurance companies. The values in the original proof of loss were padded; they were padded in the several pleadings filed in this case and in the attempted proof at the trial. When such an overvaluation is incorporated in a proof of loss or other sworn statement designed to induce its payment, it will defeat recovery on the policy of insurance. Claflin v. Commonwealth Ins. Co., 110 U. S. 81, 3 S. Ct. 507, 28 L. Ed. 76; Columbian Ins. Company v. Modern Laundry, Inc. (C. C. A. 8) 277 F. 355, 360, 20 A. L. R. 1159; Atlas Assurance Co., Ltd., v. Hurst (C. C. A. 8) 11 F.(2d) 250; 20 A. L. R. 1168, Note; Follett v. Standard Fire Ins. Co., 77 N. H. 457, 92 A. 956; Liberty Tea Co. v. La Salle Fire Ins. Co. (Wis.) 238 N. W. 399. There is some conflict in the authorities as to whether false swearing at the trial is ground for avoiding the policy. The cases cited support the view that it does. The false swearing in the proof of loss is, however, sufficient in itself to defeat recovery, and the fraud in connection with the other claims of loss and the testimony of the plaintiff at the trial are merely cumulative in their effect. In considering this defense, it must be remembered that this is a suit in equity with its historic requirement that he who seeks equitable relief must come into court with clean hands.

■ Plaintiff attempts to avoid responsibility for any overvaluation on the ground that proofs of loss and the foundations for the claims sued for in this action were prepared by his bookkeeper and accountants hired by him, and that he merely signed what was presented to him. I believe the evidence shows that such was not the fact—that plaintiff knew what was in his factory and that his claim of loss was overvalued. In any event, under the circumstances of this case, the knowledge of his agents would be imputed to him. 27 Corpus Juris, p. 56; American Eagle Fire Ins. Co. v. Vaughan (C. C. A. 4) 35 F.(2d) 147; Mick v. Corporation of Royal Exchange Assurance, 87 N. J. Law, 607, 91 A. 102, 52 L. R. A. (N. S.) 1074; Saidel v. Union Assurance Soc., 84 N. H. 232, 149 A. 78.

■ With reference to fraudulent intent, the rule is well stated in Columbian Ins. Co. v. Modern Laundry, Inc., supra: "Where the insured knowingly and willfully makes a false statement of or regarding a material fact in its proof of loss, or in its testimony regarding the value of the property insured, or the loss or damage thereto by fire, the intention to deceive the insurer is necessarily implied as the natural consequence of such act." See further authorities cited in this case.

The heart of the plaintiff's contention is that large quantities of goods were burned out of sight. The evidence as to the quantity and grades of merchandise remaining after the fire is complete. The valuation of these materials and determination of the extent of the damage to them are not difficult problems. The amount of damage as evidenced by these materials is so far below even the lowest claim of loss that, unless large quantities were burned out of sight, plaintiff's claims are so excessive as to be false and fraudulent.

By stock burned out of sight I mean merchandise which has been burned to an ash or into such small particles that it might be washed away by streams of water or swept into the débris. Merchandise is not burned out of sight when it may be identified as to quality and approximate previous quantity.

Plaintiff contends that burlap burns rapidly, and even advanced the theory that it was subject to spontaneous combustion. Disinterested witnesses, including the fire department officials and men in the burlap business who were familiar with fires in burlap, stated that burlap burns readily only if exposed to an intense heat and if not piled or baled. An experiment made in court by igniting a small quantity of burlap demonstrated that it flashed up quickly for a few seconds, but immediately died out. It is very difficult to burn burlap when piled or baled. If baled, it is practically impossible to burn it out of sight. One witness with long experience in the burlap business testified that he had seen baled burlap come out of the hold of a ship where there had been fire for considerable time, and estimated that it would take a week for a bale of burlap to burn. In a recent fire in another bag factory, the building was practically burned down, yet bales of burlap which had fallen through the floors could still be identified. A class C building, such as the one housing plaintiff's factory, would be consumed before the baled burlap.

No great damage was done to the building or to the machinery. The principal burning was in and around the stair well and in the ceiling of the fourth floor and the roof above. There was some burning back of the office on the first floor. The pictures taken the Monday after the fire by the police department and under the supervision of the fire patrol, which are exhibits in the case, are helpful in showing the extent of the burning. The walls of the stair well were burned through only in a small section near the ceiling of the third floor and near the ceiling of the fourth floor. The stairs were in no place burned through and were strong enough to be used after the fire. The floors were not burned through except for one place on the first floor. The lint on the joists in some sections of the building not far from the fire area had not even been singed, and thread in nearby sewing machines was unburned. A window of the second floor was cold to the touch of the chief responding to the first alarm. On the fourth floor, where the fire was burning most strongly, it was put out in not more than thirty minutes; the fires on the other floors were put out in from five to fifteen minutes. It took longest to overhaul the stock (overhauling means opening up stock in which there is fire and wetting it thoroughly to prevent re-ignition) on the mezzanine floor where the fire was smudgy, yet that was completed in forty-five minutes. At the end of twenty minutes all but four of the companies were sent away. The water tower never went into action. A significant comparison was made with two other recent fires in bag factories. One took eighteen hours to overhaul and the other took eleven hours to overhaul.

From the evidence as to the extent of damage to the building, one would infer that the damage to the stock would not be great. The testimony of the fire chiefs was that the fire in the stock was not extensive and that probably none was obliterated by the fire. According to them, there was very little ash in the burned sections of the building. I believe that some of the stock was burned out of sight, but that the amount was small. If it were necessary to determine the amount of the out of sight loss, I should find that it was the difference between the perpetual inventory kept by plaintiff as of the date of the fire and the merchandise removed after the fire and counted by Radford, or approximately the sum of $2,000. Much of the merchandise in the factory was undamaged by fire, water, or smoke. It was covered with tarpaulins by the fire patrol while the fire was being put out. Men in the burlap business who carefully inspected the goods with the idea of bidding upon it at the auction testified that at least 75 per cent. of the stock could be made into new bags and that some use could be made of a large part of the damaged material. Some of this was partly burned, some merely scorched, and some stained by water or chemicals.

The strongest evidence introduced in behalf of plaintiff's contention that great quantities of stock were obliterated, aside from the testimony of the accountants, was the testimony as to the débris. As to the quantity and character of the débris, there is serious conflict of testimony. In the light of the evidence which I have just discussed, it is incredible that the débris consisted to any large extent of ash or stock burned beyond recognition.

Not only does the proof show negatively that there was no substantial quantity of merchandise obliterated by the fire, but it shows affirmatively that the amounts claimed were fraudulently built up.

Plaintiff, on the witness stand, devoted

most of the first day of the trial to establish the accuracy and completeness of his books. Numerous forms were introduced in evidence which had been devised by him as the careful executive in direct supervision of his business to follow the materials from receipt through the process of manufacture and sale, so that at any time the contents of the factory could be calculated. Subsequently in the course of the trial plaintiff repudiated the accuracy of these books.

The books show a total value at both the factory and plaintiff's warehouse of $153,056.36. Deducting from this the values at the warehouse established by count immediately after the fire, we find that the books show a value at the factory of $89,383. Strikingly similar is the value shown by the perpetual inventory or summary of stock sheets kept by Taylor, plaintiff's accountant. Taylor denied ever having had such a document, but admits that he made up a summary after the fire for his own use. Plaintiff admitted that Taylor kept such a perpetual inventory. An employee of Ernst & Ernst, Rosslow, admitted that he had seen such a paper. Others testified that they had seen such a document. Radford also saw it and checked with Taylor the various lots when he was making his count. A summary was made of it by Mr. Hart, an accountant who worked on the books in connection with the use and occupancy hearing, and it is from his worksheet that we know the total of $88,272.55, only $1,111 less than the book values. Plaintiff has failed to comply with repeated demands to produce this at the trial. Further, there is a journal entry showing products on hand on the date of the fire made after the fire which varies from the perpetual inventory by only $14.00. Furthermore, the proof of loss, based on Radford's count made after the fire, shows values at the factory after the fire of $86,816. The testimony of Hart as to the deductions which should be made from the values fixed by the Hood & Strong second report shows that their valuation should be reduced to $91,000, another figure significantly near the book value.

As further evidence that there was little or no merchandise burned out of sight, the count of the bags in process of manufacture is important. The records of the company show 190,571 bags in process on the night of the fire. Radford's count showed 189,392 identifiable after the fire, a loss of less than 1 per cent.

Reference has been made to Radford's count or inventory. He was employed by the adjuster for the insurance companies to inventory all of the stock in the factory after the fire which could be identified in order that its pre-fire value could be fixed. As he worked, he checked with Taylor, and his results were adopted by plaintiff in making his proofs of loss. As I shall point out, the pricing and grading of this inventory were wrong in certain respects; nevertheless the close approximation of this figure to the book values supports the view that the plaintiff knew that there was little or no goods burned out of sight, and that he deliberately suppressed the records showing values before the fire of nearly the same amount.

The fraudulent padding commenced with the pricing and grading of this inventory. Since plaintiff was claiming, as the measure of his damages on the salvaged stock, the difference between the value of this inventory and the proceeds of the auction sale, it was to his interest to have the valuation as high as possible. Radford was not a burlap man, and had one of plaintiff's employees give him the grades of the stock. Taylor, who priced the inventory, admitted on cross-examination that he knew that the grades were raised and that there was no such quantity of certain high grades of burlap in the factory at the time, and that the mistake in grading added some $6,000 to the values. He said he merely priced the grades the inventory called for. Hyland and Taylor were familiar with the grades in the factory, for Hyland did the purchasing and Taylor kept the books, and the evidence shows that Radford was either deliberately misled as to grades or that the mistake was permitted to remain with full knowledge that it was there.

█ There was a deliberate deception as to price. The inventory was priced according to the Bemis so-called large quantity price list. This was actually a retail price list for use by the Bemis Company's salesmen. Plaintiff was not entitled to recover the retail price of the damaged stock. He was entitled to recover its replacement cost as of the time of the fire which he as a large purchaser could procure. Not only did plaintiff use the retail price, but he attempted to suppress quotations as to price from other dealers, and succeeded in suppressing them, and withheld information as to his own costs. Furthermore, to this retail price was added a half a cent a yard to cover cable tolls, and other expenses which might have been properly added to a landed cost but obviously not to a retail price. As a matter of fact, plaintiff first

testified that the inventory had been priced at landed cost, but admitted under cross-examination that this Bemis price list was used. Plaintiff's adjuster testified that the matter of replacement values was left to plaintiff, who was, according to his own testimony and that of others, a shrewd buyer and knew burlap prices thoroughly. He nevertheless used a price from two to four cents a yard higher than the prices at which he could have replaced his materials.

In the case of Orenstein v. Star Ins. Co., supra, it was held that oath as to excessive values is not a mere matter of opinion. "It was a sworn estimate of value by one having special knowledge of the property made, with the intent that the other party, ignorant on the subject, and with unequal means of information, should rely upon it to his injury."

Plaintiff's original claim of loss was predicated upon values in the factory before the fire of $102,453.23. Deducting from this the valuation of Radford's inventory of $86,-807.98, the out of sight loss was claimed to be $15,645.25. The damage to the salvaged merchandise was computed by deducting from Radford's inventory the amount of the auction sale proceeds held several months later, and the amount of that loss was claimed to be $53,586.

The total valuation was based on the first Hood & Strong report prepared in late November, 1929. This report was based on data flagrantly insufficient. Plaintiff failed to give the accountants an inventory and balance sheet prepared by Ernst & Ernst as of May 31, 1929, which, according to accounting practice, should have been the starting point of the calculations, the perpetual inventory kept by Taylor, and certain physical inventories taken shortly before the fire. Instead, he furnished them with an inventory of December 31, 1928, and asked them to build up an inventory as of the date of the fire based on the old inventory, purchases and sales, and the gross profits for the year 1928. Such values would be entirely theoretical, and would be based upon the assumption that profits for one year would be repeated the succeeding year. It is in itself significant that Hood & Strong were employed for the preparation of this report and the reports on which this case went to trial instead of Ernst & Ernst, who were familiar with the books and had their work sheets for the May, 1929, inventory.

What I have said about the impossibility of an out of sight loss in this case establishes that the claim of $15,000 worth of goods obliterated as well as the subsequent claim of a larger amount were alike fraudulently excessive.

There was lack of good faith in fixing the proportion of loss on the salvaged goods. I have referred to the fact that disinterested witnesses have testified that this merchandise was damaged not in excess of 25 per cent. Yet a loss of $53,586 was claimed on this. It is fortunately not necessary to decide what proportion of loss plaintiff would be entitled to upon this merchandise, for the sale of the entire stock at auction and the delay in holding the sale was apparently consented to by the insurance companies. It is noteworthy, however, that, had plaintiff not gone out of business after the fire, he could have used all of the undamaged stock in his business and could have recovered no such loss.

The amended complaint in this action and the additional claims advanced at the trial are based upon the second Hood & Strong report and supplements thereto. Briefly, this is founded upon the Ernst & Ernst inventory of May 31, 1929, and the values as of the date of the fire were built up by adding purchases and deducting sales, making various adjustments for overhead, etc. Defendant has established that at least $41,361.12 should be deducted from the values claimed because of duplications. I shall discuss two of these duplications because they illustrate the fraudulent manipulations of records by plaintiff and also show the significance of the employment of a different firm of accountants to build up values on the basis of the Ernst & Ernst inventory. A certain numbered stock sheet was given Hood & Strong representing a purchase of burlap from H. M. Newhall & Co. for $22,737, which arrived on the "Silver Elm" as a purchase subsequent to the Ernst & Ernst inventory. The stock sheet was originally dated in May, 1929; the May was crossed out and June written in above. It was contended that this material had not been counted by Rosslow, who prepared the Ernst & Ernst inventory, because it was on the dock at the time. The work sheets of Rosslow show that the full value of this was taken into account and included in his total. His work sheet gives the very number of the stock sheet, mentions that it is a Newhall contract, and that it is recorded but not inventoried. The other duplication which I shall discuss is of a purchase of fifty bales of burlap. This is shown by a stock sheet apparently dated June 20, 1929. However, it is also numbered, and the numbers on either side show merchandise received in April.

There is an erasure under the month, and on inspection it shows that April has been erased and June typed over it. The explanation offered that both these lots of burlap were being held for Newhall Company is unsupported by the Newhall records, and is entirely unconvincing.

The claim of approximately $46,000 in merchandise values burned out of sight is largely accounted for by demonstrated duplications amounting to more than $41,000. Hart, the accountant testifying to the duplications, further testified that the books of plaintiff were in such a condition that it was impossible to make an accurate audit of them, thus explaining why the difference was not completely accounted for and why defendants could not offer proof of what the values in the factory at the time of the fire were.

· If the quantity of merchandise claimed to have been obliterated had been in the factory at the time of the fire, the building housing the factory would have been taxed with a load beyond its capacity. This was demonstrated by models of the factory and of baled burlap, etc., which were introduced in evidence by defendants.

In connection with the contents of the building before the fire, mention must be made of plaintiff's testimony at the use and occupancy (referred to as the U. & O.) hearing as to the contents of the second floor. Counsel for plaintiff has vigorously argued that this testimony should be stricken from the record because it is claimed to be cross-examination and impeachment on a collateral matter. Early in his cross-examination, plaintiff stated in effect that he did not know what was on the second floor immediately before the fire. To contradict this testimony, plaintiff was confronted with his testimony at the U. & O. hearing, which was an arbitration proceeding involving other policies on which there had been a loss due to the same fire. He had there testified with some particularity that prior to the fire the second floor was filled with merchandise and in general described the quantity and type. In the course of his cross-examination he in effect adopted the testimony given at that hearing.

 It is true, and perhaps significant, that plaintiff did not testify on his direct examination to this detail of his case. He did, however, testify as to the contents of this floor after the fire and as to his personal management of the business. His knowledge as to details of the business was in general within the scope of his direct examination. While cross-examination should be confined to the subjects covered by the direct examination, it need not be limited to the details testified to, but may cover the full scope of the subject-matter inquired into. Commercial State Bank v. Moore (C. C. A. 8) 227 F. 19. Furthermore, the cross-examination of a party is allowed more latitude than that of other witnesses, and it is within the court's discretion to permit cross-examination as to matters not covered in the direct examination. Byrne Federal Evidence, p. 596; Rea v. Missouri, 17 Wall. 532, 21 L. Ed. 707. As to impeachment, a witness may be impeached upon collateral matters which are relevant to the issue to be tried. A matter is relevant to the issues if it tends to illustrate or throw light on the transaction in controversy. Moody v. Peirano, 4 Cal. App. 411, 88 P. 380; Commercial State Bank v. Moore, supra; Byrne Federal Evidence, p. 597. Certainly the contents of the floors of the factory and plaintiff's knowledge of them are relevant to the issues in this case. The evidence is therefore properly admissible to impeach plaintiff. It is further admissible generally as proof of another fraud or fraudulent representation of the same character committed at or near the same time to show intent or knowledge. 12 Cal. Juris. p. 831; Wellnitz v. Sacramento Suburban Fruit Lands Co., 97 Cal. App. 51, 274 P. 1016, 276 P. 154; Liberty Bank v. Nonnenmann, 96 Cal. App. 478, 274 P. 568; 27 Corpus Juris, p. 60; Sacramento Suburban Fruit Lands Co. v. Elm, 29 F.(2d) 233 (C. C. A. 9). Without going into the nature of use and occupancy insurance, it is evident that his loss on that account would be enhanced if his stock on hand were claimed to be greater than it actually was. His padding of values at that hearing and his conduct with reference to the claims of loss involved in this case warrant the inference that the frauds are part of a general scheme or purpose to defraud. 27 Corpus Juris, p. 61.

The quantities of merchandise which plaintiff testified were on the second floor of the factory at the U. & O. hearing were greatly exaggerated. Defendants have prepared an exhibit to demonstrate the physical impossibility of the truth of this testimony. It would fill the floor with stock to the height of the ceiling and above, leaving no room for aisles and the machinery on the floor and for the employees to move about at their work. This is not such an overvaluation as might result from an honest mistake. Plaintiff, as an expert in the burlap business, knew the space which quantities of burlap occupy, and also knew the capacity of his own factory.

Counsel for plaintiff argues that the U. & O. testimony is not a definite statement, but is merely an approximation of the quantities. Unless one is testifying from a computation, all estimates of quantity are but approximations, but the one in question is so far removed from the possible contents that it is incredible that a man in plaintiff's position should have offered it in good faith.

The impeachment of plaintiff on this point may well be considered in connection with his impeachment as to price which I shall discuss in connection with the Newhall fictitious contracts.

█ The policies in question provide that, if the company and the insured fail to agree as to the amount of the loss, the company may demand an appraisement. Each party shall name a competent and disinterested appraiser, and they shall in turn select an umpire. If the appraisement is not completed within ninety days after receipt of proof of loss, the assured may then commence an action upon the policy. The companies which had written the five primary policies aggregating $50,000 loss, set up as a special defense that the appraisers named did not agree upon the selection of an umpire, and that "the appraisement was not had due to the acts of the plaintiff and the appraiser appointed by him and this action was commenced before compliance by the plaintiff with the provisions of each of said policies of insurance regarding the appraisement of the loss."

Compliance with the arbitration clause in these policies is a condition precedent to a suit upon the policy. Old Saucelito Land & Dry Dock Co. v. Commercial Union Assur. Co., 66 Cal. 253, 5 P. 232; Carroll v. Girard Fire Ins. Co., 72 Cal. 297, 13 P. 863.

█ It is contended that the failure to agree upon the appointment of an umpire and to reach an appraisement is due to the fact that Colbert, who was appointed by plaintiff as his appraiser, was not disinterested. I would not regard it seriously if plaintiff had appointed a man whose interests were openly identified with his, but who would make a bona fide attempt to reach a fair appraisement. The vice in appointing Colbert lay in the fact that his connection with plaintiff was secret and tainted with fraud. He was a trusted employee of a large importing firm, with an excellent standing in the community; ostensibly he was a proper person for plaintiff to appoint. Plaintiff was a large customer of Colbert's employers, and his business interests were adverse to theirs, but plaintiff nevertheless had Colbert in his pay.

Plaintiff's pay roll for September, 1929, the month before the fire, shows payment of $250 to Colbert. A journal entry of July, 1929, personally approved by the signature of plaintiff, shows commissions due Colbert on purchases by contracts with H. M. Newhall & Co., his employers, of three-fourths of a cent a yard, amounting to $437.50, paid partly by discharging a loan to Colbert and partly by plaintiff's voucher. Those entries have not been satisfactorily explained by plaintiff, and his own records, therefore, show that the man he appointed as an appraiser was in fact a bribed employee of a firm with which he had extensive dealings. There is evidence tending to show that Colbert on at least one occasion permitted plaintiff to pay less for goods than the price called for by his contract for their purchase with the Newhall Company, and thus deprived his employers of the benefit of a favorable contract.

Not only was Colbert induced by plaintiff to betray the interests of his employer, but the evidence also shows that plaintiff used Colbert as a tool in his attempt to get an excessive award for his loss at the U. & O. hearing. This was attempted by the use of the so-called fictitious Newhall contracts which bore dates previous to the fire and called for delivery after the fire. A month or two after the fire Colbert furnished plaintiff, at the latter's request, with contract blanks of the Newhall Company, and plaintiff filled them out as to quantities, description, and prices; Colbert stamping or signing the contracts and checking the prices to ascertain that they were approximately correct. These contracts called for the delivery of some 2,400,000 yards of material at a cost of $185,325. The significance of these contracts was shown by one of plaintiff's own witnesses. In order to enhance plaintiff's loss from being deprived of the use of the building, it was necessary to show that plaintiff had contracts for the delivery of quantities of raw material. These contracts were added to the bona fide ones for that purpose.

There is much mystery in connection with these contracts. Plaintiff contends that they were actual contracts; Colbert testified that they were made up to be canceled and were canceled. They were used at the U. & O. hearing, but, in the face of persistent demand, were not produced by plaintiff at this trial. These purported contracts bore serial numbers which were supposed to be their Newhall Company numbers. Newhall contracts were listed in a register of contracts kept by that firm, and each bore a serial num-

ber. The records of Newhall Company were produced in court, and it was shown that not one of the numbers given was the number of a contract with plaintiff. Whatever may have happened to these contracts, the records of Newhall Company show that they were unquestionably fictitious. In the face of the evidence, plaintiff's contention that these contracts were valid is incredible.

Colbert testified that within two or three weeks prior to December 2, 1931 (the date when he was testifying), and after the commencement of this trial, plaintiff approached him, saying that the prices on these contracts were too low and asked him to negotiate new contracts to be substituted for them. Colbert supplied him with new blanks, the contracts were made up, were signed and canceled in Colbert's presence, and taken away by plaintiff. I believe Colbert's testimony as to this transaction. It is significant and it is in line with plaintiff's other conduct, but I do not understand nor has it been shown what plaintiff expected to do with these contracts. It might be thought that plaintiff wanted them to produce at the trial in response to the repeated demands for them. Since defendants already knew what prices the contracts called for, it is, as pointed out by counsel for plaintiff, incredible that he should want different ones for that purpose.

The incident of the fictitious contracts, in line with many others discussed in the course of this opinion, certainly shows bad faith on the part of plaintiff, and the evidence suggests that plaintiff is responsible for the failure to settle the loss by arbitration.

 The admission of the evidence as to these fictitious contracts has been objected to by plaintiff. This evidence is properly admissible upon three grounds: First, it is admissible to characterize the relationship between plaintiff and the appraiser appointed by him and show that the appraiser was not only not a disinterested one, but that he was fully co-operating with plaintiff in his fraudulent scheme. If plaintiff did not want a settlement of the loss by arbitration, his appraiser could be counted upon to block it. Second, it is admissible as evidence of a substantially contemporaneous fraudulent act of plaintiff for the same reason and upon the same authority that plaintiff's testimony at the U. & O. hearing was admissible. In a case involving fraud, the court has a wide latitude in admitting evidence of every circumstance relative to the condition and relation of the parties and subject-matter and

every act and declaration of the party charged with fraud. 27 Corpus Juris, p. 51. Third, like the testimony at the U. & O. hearing, it is also admissible to impeach plaintiff. Plaintiff testified to the price of burlap on his direct examination, and gave prices materially higher than those called for by the contracts. Defendants had in their possession a copy of a summary of those contracts which had been prepared by plaintiff's accountant, Parker, and cross-examined plaintiff with reference to them. It was at this time that defendants first demanded the production of these contracts, but they were never produced. The summary was introduced to give the substance of the contracts, and was used to impeach plaintiff as to burlap prices. These contracts called for deliveries during October and November, and, had they not been canceled and were actual contracts, would have enabled plaintiff to replace all of the materials of that type which he claimed had been destroyed with the burlap covered by these contracts. Furthermore, the prices varied but slightly from the prices given by the experts called by defendant and corroborated their figures. The evidence is relevant to the question of price, and it was proper to use them to impeach plaintiff's testimony on that point.

The whole course of Colbert's dealing with the appraiser appointed by the insurance companies was designed to defeat an appraisement of the loss according to the terms of the policy. The correspondence between them showed a great number of names proposed as umpire. The insurance companies contend that the names suggested by Colbert were of men under obligations to plaintiff. Finally, a man was agreed upon by the appraisers who is an expert in the burlap business and who is conceded to be a man of unquestioned fairness and integrity. That the agreement was only ostensible was shown by this gentleman's testimony explaining his refusal to serve. He said that Colbert approached him, and, when Colbert discovered that he believed that a substantial out of sight loss was impossible, he (Colbert) suggested that he decline to serve as umpire.

In this connection it is appropriate to say that I believe that a loss of this type should be settled by arbitration. Both parties would have the benefit of the determination of the extent of the loss by experts in the business. Due to the conduct of plaintiff and his appraiser, this was not done, and this suit was instituted. The trial of the case consumed the best part of three months, and

has been a great expense to both plaintiff and the defendant insurance companies. The careful and able work of counsel for both sides in the trial and argument of the case has been of great assistance to the court, and acknowledgment of it is appreciatively given.

Turning again to the question of fraud, since fraud is never presumed, and since a forfeiture should not be decreed unless the evidence clearly warrants it, I have discussed with some detail the evidence which I believe supports my finding that plaintiff was guilty of wilful and intentional fraud and false swearing in connection with his proofs of loss, and the pleadings and testimony in this case, and that his conduct has barred his right of recovery herein. I have not, however, discussed all of the evidence which supports my decision, but have selected that which best illustrates, in my view, the attitude and conduct of the plaintiff. Because of the serious reflection of this decision upon plaintiff, I have reached it reluctantly, but feel that it is necessitated by the evidence introduced in the case.

Other issues have been argued by counsel, and the evidence relating thereto has been extensive. The evidence on the phases which I have discussed, being clear and convincing, bars plaintiff's right to recover, and makes it unnecessary to discuss or find upon the other issues. In view of the discussion of the facts and the law in this opinion, I adopt it as my findings of fact and conclusions of law, and the motions of the respective parties for special findings are denied and exceptions noted. Parker v. St. Sure, 53 F.(2d) 706 (C. C. A. 2).

Let decree be entered for defendants, with costs.