## PHILADELPHIA STORAGE BATTERY CO. v. KELLEY-HOW-THOMSON CO.

### No. 9617.

Circuit Court of Appeals, Eighth Circuit.
April 24, 1933.

Rehearing Denied May 31, 1933.

D. S. Holmes, of Duluth, Minn. (R. L. Mayall, of Duluth, Minn., W. Barclay Lex, of Philadelphia, Pa., Baldwin, Holmes, Mayall & Reavill, of Duluth, Minn., and Hepburn & Norris, of Philadelphia, Pa., on the brief), for appellant.

James G. Nye, of Duluth, Minn. (Oscar Mitchell, A. C. Gillette, Donald D. Harries, and Mitchell, Gillette, Nye & Harries, all of Duluth, Minn., on the brief), for appellee.

Before STONE, GARDNER, and SANBORN, Circuit Judges.

## GARDNER, Circuit Judge.

This is an appeal from a judgment rendered in favor of appellee in an action for damages for fraud and deceit. The parties will be referred to as they appeared below.

Plaintiff is a hardware jobber, with headquarters at Duluth, Minn., and having dealer customers throughout the Northwest, from Northern Michigan to Montana. Defendant is a manufacturer of storage batteries and of radios and radio accessories, which are marketed and advertised under the trade-name "Philco." The parties had had business relations with each other for a number of years prior to the occurrences here involved.

The cause of action is claimed to have arisen in January, 1930, at which time plaintiff was distributor of defendant's radios and accessories under a contract, which, by its terms, expired May 1, 1930. Plaintiff in substance claims that it undertook an advertising and sales promotion program for defendant's radio products in reliance on certain promises made to it by the defendant on January 3, 1930, from which it was inferred and understood that plaintiff would be continued as the distributor of defendant's products in the above-mentioned territory during the year 1930. When plaintiff's contract expired, however, it was not renewed, and the damages claimed are those caused by the expenses incurred by plaintiff in undertaking the advertising and promotion program induced by defendant.

The written contract between plaintiff and defendant, which, as noted, by its terms, was to expire May 1, 1930, provided for certain quotas of purchases by plaintiff from defendant for the period May 1, 1929, to January 1, 1930; but the quota of purchases for the period January 1, 1930, to May 1, 1930, was to be announced by defendant. These quotas were not binding on plaintiff, but defendant was given the right forthwith to terminate the agreement upon plaintiff's failure to order in accordance with its quota.

At the time of the negotiations involved in this action, defendant was represented by Mr. Ramsdell, its manager of sales promotion, in charge of advertising for sales promotion; Mr. Skinner, its vice president and general manager in charge of all sales and advertising, over Ramsdell; and Mr. Heberling, its manager of the central division under Skinner and Ramsdell. For plaintiff, the negotiations were carried on by Mr. Barnes, Mr. Welles, and Mr. Higgins.

In the radio trade it had been customary for the manufacturers to produce their new models twice a year, in January and June. In December, 1929, a jobber's meeting was held at Philadelphia, preliminary to the introduction of the January, 1930, models. This meeting was attended by Mr. Welles and Mr. Barnes; and defendant there announced that its distributors, before leaving, would be expected to sign orders for a certain quota of radios, and Mr. Skinner, on behalf of defendant, announced that if 80 per cent. of the distributors were able to sell their allotment or quota, and 20 per cent. could not do so, that defendant would be forced, at the close of the radio season, to replace such delinquent distributors. Defendant determined the quotas by estimating the total number of radio sets which could be sold in the territory, and then apportioning this total number among the various distributors on the basis of certain factors, the most important of which was the number of wired homes in the territory of each distributor.

At the close of this Philadelphia meeting, Mr. Heberling presented to Mr. Welles and Mr. Barnes proposed orders for January and February radio requirements of plaintiff. Barnes and Welles protested that the order was too large, and that they had no authority to sign it. It was then agreed that they should return to Duluth and report the quota demanded, and that Heberling would shortly come to Duluth to discuss the whole matter; and on January 3, Heberling and Ramsdell came to Duluth, where conference was held between them and representatives of plaintiff. It is during the conversations had at this meeting that the fraudulent representations forming the basis of this action are alleged to have been made.

Defendant's representatives proposed a reorganization of plaintiff's business, the establishment of a separate radio department, and the employment of additional special radio salesmen, and the embarking on an extensive advertising program. It is plaintiff's claim that its officers objected to the large expense that would be incurred should it adopt the program of defendant for the reorganization of its business and for advertising, and that it could not, in the remaining months of its contract, which included the first few months of the year, sell enough radios to warrant these expenditures. It is claimed that in answer to these protests defendant's

representatives gave assurance to the plaintiff that if it embarked on defendant's program, that while it might not prove remunerative during the early months of 1930, the profit from this business in the second half of the year would be so substantial as to render a normal profit for the entire period; and that plaintiff, believing and relying upon the assurance that it would be continued as defendant's distributor after the expiration of its contract, was induced by the representations and promises to that effect made by defendant, to embark on defendant's expansive program of reorganization and advertising, and expended large sums of money in carrying out its undertaking.

At the close of all the testimony, counsel for defendant moved for a directed verdict, which motion was denied. The jury returned a verdict in favor of plaintiff, and from a judgment of $18,131.55 entered thereon, the defendant prosecutes this appeal, assigning numerous errors, all of which, however, are substantially embodied in the alleged error of the court in denying defendant's motion for a directed verdict.

In discussing this question we do not perform the functions of a jury, but only determine whether or not there is substantial evidence to sustain the verdict. We must assume that the jury believed plaintiff's version of the negotiations of January 3, 1930. In referring to that conference, plaintiff's witness Barnes testified: "We said we thought that was too many radio sets for us to buy at that time of the year and that our records in the past would indicate we couldn't sell that many radio sets, and Mr. Heberling said he would cut the number in two and we would have to buy only half that number, or something over 4,000 sets, and Mr. Welles, Jr., discussed or stated that he did not believe we could profitably spend all the money necessary to follow the program out. Mr. Heberling stated that we could increase our sales greatly if we would reorganize and form a separate radio division, not just a department of the Kelley-How Company, but that we should have a separate sales division, and it was decided that we would form such a division and that George Welles, Jr., should be in charge of sales of that division. Mr. Heberling also stated we should have more specialty salesmen, and there were details discussed as to how they should operate. We stated that we didn't see how we could afford to do that then and Mr. Heberling or Mr. Ramsdell stated or brought out the same statement that had been made at Philadelphia

that if we spent this money and put on extra salesmen and reorganized our department that in the fall of 1930 we would sell a larger number of radio sets and the year as a whole would be profitable."

Mr. Welles, on behalf of plaintiff, testified: "One of the objections which I brought up at that time was that I could not see how any organization could get underway to the extent that it would be necessary to cash in on such an advertising program or sales program considering the expense involved during the first five months. It was stated by Mr. Ramsdell or Mr. Heberling that they realized the program seemed large, but if it wasn't cashed in on during the first six months that during the second six months when the radio season was at its height we would probably double or treble our sales because of the background laid in the spring. * * * I refer to the representations of Mr. Heberling and Mr. Ramsdell on January 3d, which were such as to make us believe we would continue with the distributorship of the Philco line during 1930, that this advertising would be cumulative in its effect and even though it was not immediately profited by, it would be profited by in the later part of the year when the radio season was at its height. * * * I said that I didn't see how we could cash in on such an expenditure in the first five months of the year, and Mr. Heberling said that, if we didn't cash in on it in the first five months the profit in the second half of the year would be substantially enough to give us a normal profit over the entire period."

Mr. Higgins, testifying for plaintiff, among other things said: "It was said by some of these gentlemen (Heberling and Ramsdell) that while the campaign would be expensive during the spring and probably not bring a satisfactory return, that we could hope to receive returns during the fall by keeping the name Philco before the public."

There was evidence to the effect that the later months of the year were more favorable for the sale of radios than were the earlier months, and that upwards of 75 per cent. of the radio business was done during the second half of the calendar year.

Plaintiff, acting on these statements and representations, embarked on defendant's program, expending thereon very large sums of money. Its radio department was made a separate division, and substantially all of the suggestions and requests of the defendant were carried out with no word of criticism or warning from the defendant from January 3d

to May 9th, on which latter date defendant announced that it would no longer sell radios to plaintiff, and that their relationship had ended. Plaintiff's organization of some six hundred dealers went in a body to the newly selected distributor.

The evidence, we think, was sufficient to sustain the claim of plaintiff as to the representations and promises made by the defendant; that they were believed by the plaintiff; that they were relied upon; and that they induced plaintiff to enter upon the reorganization and selling program urged by the defendant; and that plaintiff suffered the damages reflected in the jury's verdict. It is urged by defendant, however, that these statements, promises, and representations were in the nature of promises or prophecies as to the future, and did not constitute any representation as to a present fact or condition. It is well settled that an action to recover damages for fraud and deceit cannot be maintained upon a mere promise or prophecy. Union Pacific Ry. Co. v. Barnes (C. C. A. 8) 64 F. 80; Kimber v. Young (C. C. A. 8) 137 F. 744; Farwell v. Colonial Trust Co. (C. C. A. 8) 147 F. 480; New York Life Ins. Co. v. McMaster (C. C. A. 8) 87 F. 63; Towle v. Maxwell Motor Sales Corp. (C. C. A. 8) 26 F.(2d) 209; Southern Surety Co. v. Fidelity & Casualty Co. (C. C. A. 8) 50 F.(2d) 16. If, however, the promises and representations regarding a future event are made with fraudulent intent, for the purpose of deceiving, and without any purpose or intent to perform, then a very different situation arises. If, in the instant case, the defendant, as the jury by its verdict found, falsely represented to plaintiff that it would be continued as defendant's distributor of radios during the year 1930, intending at the time not so to continue the plaintiff as its distributor, this was an actionable fraud, rather than a mere promise or prophecy. When defendant made these representations it impliedly, if not expressly, represented that it had an existing intent to fulfil its promise, and such implied representation of an existing intent, purpose, or state of mind was one of fact. Rogers v. Virginia-Carolina Chemical Co. (C. C. A. 3) 149 F. 1, 13; In re Hunter-Rand Co. (D. C.) 241 F. 175; Edgington v. Fitzmaurice, L. R. 29 Ch. Div. (Eng.) 459; Erskine v. Chevrolet Motors Co., 185 N. C. 479, 117 S. E. 706, 32 A. L. R. 196; Holmes v. Wilkes, 130 Minn. 170, 153 N. W. 308; McElrath v. Electric Investment Co., 114 Minn. 358, 131 N. W. 380; Cox v. Edwards, 120 Minn. 512, 139 N. W. 1070; Buhler v. Loftus, 53 Mont. 546, 165 P. 601; Adams v. Gillig, 199 N. Y. 314, 92 N. E. 670, 32 L. R. A. (N. S.) 127, 20 Ann. Cas. 910; Ritzwoller v. Lurie, 225 N. Y. 464, 122 N. E. 634; Deyo v. Hudson, 225 N. Y. 602, 122 N. E. 635.

In Rogers v. Virginia-Carolina Chemical Company, supra, the court said: "There is a prima facie presumption of fairness and honesty in the dealings of mankind, and, where one man makes a promise to another as an inducement for a change of position or other action on the part of the latter, he, if not expressly, impliedly avers that he has an existing intent to fulfill his promise, and such implied averment of existing intent is of matter of fact and, if false and fraudulent, is a fraudulent representation, which may or may not, according to circumstances, furnish the basis for an action ex delicto."

In Edgington v. Fitzmaurice, supra, the court, speaking through Lord Bowen, said: "There must be a misstatement of an existing fact; but the state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else. A misrepresentation as to the state of a man's mind is, therefore, a misstatement of fact."

When, therefore, the defendant represented to plaintiff that if it would enter into defendant's plan of advertising and sales program, it would be continued as defendant's representative during the year 1930, it in effect represented that its then intent and purpose was so to continue plaintiff's contract of representation. It is, therefore, necessary to consider whether or not there is substantial evidence to sustain plaintiff's contention that at the time of making such promises and representations defendant did not intend to perform them.

Fraud is rarely susceptible of direct proof, but must ordinarily be established by circumstantial evidence and legitimate inferences arising therefrom, which, taken as a whole, will show the fraudulent intent or purpose with which the party acted. The inferences to be gathered from a chain of circumstances depend largely upon the common sense knowledge of the motives and intentions of men in like circumstances. While fraud, and even intent, cannot be proven by mere suspicion, it may be established by such facts and circumstances from which reasonable men would infer that the transaction was fraudulent. Mammoth Oil Co. v. United States, 275 U. S. 13, 48 S. Ct. 1, 72 L. Ed.

137; Rea v. Missouri, 17 Wall. 532, 21 L. Ed. 707; Brach v. Moen (C. C. A. 8) 35 F.(2d) 475; Glaspie v. Keator (C. C. A. 8) 56 F. 203; Drennen v. Southern States Fire Ins. Co. (C. C. A. 5) 252 F. 776.

As bearing upon the question of whether or not the defendant intended to perform its promise to continue plaintiff as its distributor, we note the following: (1) Plaintiff had declined to sign orders in December for the quota which defendant determined it should take for the following months of January and February. Defendant had threatened at that meeting that those who did not accept or dispose of the quota prescribed might be released. When the representatives of defendant came to Duluth this quota was reduced by one-half. Plaintiff accepted defendant's plan for expansion, knowing, as did also the defendant, that it could not reasonably be remunerative for the following six months. There was no complaint relative to the co-operation of the plaintiff, nor with the service it was rendering. Referring to the conference at Duluth, Heberling, testifying for the defendant, says: "On January 3rd I was considering the situation from the standpoint of continuing Kelley-How-Thomson Company after May 1st, but I did not definitely know at that time whether they would be continued or not."

Although declaring that he did not then know whether defendant was to be continued after May 1st, he was willing, according to his own testimony, that plaintiff should get the idea that it was to be so continued, and he then definitely knew that plaintiff was making vast expenditures, relying upon defendant's promise. If he did not know that defendant was to be continued, then the representations and promises made were recklessly and wantonly made, without knowing whether they were true or false. The jury may well have believed from the evidence of bad faith, which was developed, that it was the purpose of the defendant to induce plaintiff to make the expenditure of large sums of money in behalf of defendant and which would inure only to its benefit. Plaintiff had refused to go into the advertising campaign, and had refused to sign the order for 8,300 radios for January and February, and the acquiescence of defendant in a cut of this quota to one-half of the original assignment may not have been a good faith acquiescence, but defendant was temporarily making the best of an unsatisfactory situation. (2) In his testimony, Heberling admits that results from the reorganization and new advertising program could

not reasonably be expected before March or April, because it would take until the latter part of February to complete the new plan, yet representatives of defendant, in January, or at latest early in February, were secretly consulting Mr. Bigelow, president of Farwell, Osman, Kirk & Co., with a view of having that company take over defendant's business. Mr. Bigelow testified as follows: "I had a conversation early in the year 1930, somewhere near the first of the year, with representatives of the Philadelphia Storage Battery Company. Two men purporting to represent Philco conversed with me at that time. These men wished to know if we would be interested in taking on the Philco line. I told them we were not. They told about the volume of business they had been doing and I told them they would be foolish to give up a connection of that sort. I knew that Kelley-How-Thomson Company was their distributor. This was shortly after the first of the year. I have no recollection of the exact date. I think Mr. Shepherd, who has testified for the Philadelphia Storage Battery Company was one of the men who called on me shortly after the first of the year. They wished to know if we would be interested in taking on the line of Philco Radios for the Northwest in place of Kelley-How-Thomson Company in Duluth. I said that we were not interested."

Now, nothing had occurred subsequent to January 3d, at the time these promises were made, to change the intent or purpose of defendant; in fact, the campaign had fairly begun under the new program. As has been observed, results from the new plan were not to have been expected within the time intervening between January 3d and the offer of this territory to the Farwell, Osman, Kirk & Co. The incident is inconsistent with honesty and fair dealing; it is not satisfactorily explained by the defendant; and it is a familiar maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted. (3) In February Heberling meets Coleman of the Beckwith Company, the company to whom the representation was later given. True, he says the matter of discontinuing plaintiff as its representative was not discussed, but the jury was not required to believe that testimony, particularly in view of what later occurred. The meeting is a significant circumstance when considered in connection with the fact that on Heberling's return from Europe, Mr. Shepherd reported to him that, "Mr. Coleman of the Beckwith Company had interviewed him in Chicago with regard

to this distributorship." How it happened that Mr. Coleman should be in Chicago inquiring about this distributorship, if he had not before that time heard from the defendant that it contemplated a change, is not satisfactorily explained. The weight to be given to the absence of such an explanation is a matter of common sense, rather than the result of metaphysical refinement. The proof of this suspicious fact, and the failure of defendant to explain it, was properly the basis of an adverse inference, and in direct proportion as the number and curious coincidence of suspicious facts increase so also increases the weight to be given to a party's failure to explain such of those facts as are peculiarly within his control and knowledge. Bilokumsky v. Tod, 263 U. S. 149, 44 S. Ct. 54, 68 L. Ed. 221; United States v. Commissioner of Immigration, 273 U. S. 103, 47 S. Ct. 302, 71 L. Ed. 560. The jury may well have inferred that Heberling talked with Coleman in February about this very matter. Heberling says that following his conference with Shepherd in January, he then telephoned the Beckwith Company. He says: "They did not know what our proposition was, but Mr. Coleman indicated that he was sure Beckwith would be interested in any reasonable proposition." Ordinarily, curious coincidences of suspicious facts do not occur in this manner. Coleman had seen Heberling in February. He later came to Chicago to interview Shepherd about the distributorship. Of necessity he had heard somewhere, from some one, at some time, that defendant contemplated dropping plaintiff as its representative. When and where, and from whom did he get the information? This was all peculiarly within the knowledge or control of defendant, but it makes no explanation, and the jury was warranted in believing that Heberling talked the matter over with Coleman in February, and, hence, he must at that time have had in mind making the change. (4) In February an invitation was extended by defendant to certain officers of the plaintiff to join a cruise of the Philco jobbers to Bermuda, commencing May 27, 1930. On April 17, 1930, plaintiff communicated with defendant concerning reservations for the trip. Now, at that time, according to the testimony of Heberling, it had already been determined that plaintiff's relations with defendant would be discontinued, yet the defendant replied to the above inquiry, saying: "We are glad to advise you that we are taking care of both your requests." As late as April 21st, Shepherd, in answer to a communication from plaintiff with reference to future advertising through

the months of June to December, replied that, "My understanding is that this information will be available about the middle of May, and at that time sufficient material will be available to take care of your request." Similarly, on April 23d plaintiff addressed a letter to Shepherd, asking for advance information as to the new models, and on April 25th, confessedly after it had been determined to drop plaintiff, Shepherd writes plaintiff that he was not in position to give out the information requested, but that the information on the new line would be available at the time of the cruise. This was only five days before May 1st, yet all communications from defendant were susceptible only of the construction that plaintiff would be present on the Bermuda cruise, and that it would be continued as defendant's representative. These incidents and circumstances indicate that these representatives of the defendant intended to deceive plaintiff; and the jury may well have concluded that this state of mind existed not only when these various incidents occurred, but at the time defendant made the representations on January 3d. (5) The witness Heberling categorically denies that at the meeting in January, he or Mr. Ramsdell made the representations or statements attributed to them by plaintiff's witnesses, and defendant, by its answer, denies that it made such statements or representations. Such denials imply a denial of an intention to make good such representations. Woods-Faulkner & Company v. Michelson (C. C. A.) 63 F.(2d) 569; State ex rel. v. Danes, 316 Mo. 474, 290 S. W. 425; Foster v. Dwire, 51 N. D. 581, 199 N. W. 1017, 51 A. L. R. 21; Braddy v. Elliott, 146 N. C. 578, 60 S. E. 507; Texas Employers' Ins. Ass'n v. Knouff (Tex. Civ. App.) 297 S. W. 799.

We think the evidence was sufficient to sustain the finding of the jury to the effect that the defendant at the time it made its representations and promises on January 3d did not intend to perform them.

■ It is urged that the court erred because it did not use the words "clear and convincing" in connection with its charge to the jury as to the weight of evidence. No good purpose will be served by reviewing the instructions, because we are of the view that they were not prejudicial to defendant. In the course of the instructions the court told the jury that: "The law presumes, in the absence of evidence to the contrary, that business transactions are done in good faith and for an honest purpose. If the circumstances

proven are just as consistent with honesty and good faith as with fraudulent intent, the inference of fraud is not warranted. Thus where two inferences can be drawn with equal force from the facts proven, one in favor of fair dealing and good faith, and the other of corrupt motive, it is the duty of the Jury to draw the inference favorable to good faith and fair dealing."

This language was tantamount to an instruction that the evidence must be clear and convincing.

We have examined all of the other contentions of defendant, but are of the opinion that they present no prejudicial error.

The judgment appealed from is, therefore, affirmed.