## CHICAGO, M., ST. P. & P. R. R. CO. v. LINEHAN.
### No. 9698.

Circuit Court of Appeals, Eighth Circuit.
July 14, 1933.

Rehearing Denied Aug. 28, 1933.

C. O. Newcomb, of Minneapolis, Minn. (F. W. Root and A. C. Erdall, both of Minneapolis, Minn., on the brief), for appellant.

Robert J. McDonald, of Minneapolis, Minn., for appellee.

Before KENYON and GARDNER, Circuit Judges, and DEWEY, District Judge.

KENYON, Circuit Judge.

Parties will be designated as in the trial court, where appellee was plaintiff and appellant defendant.

Plaintiff was foreman of defendant's switching crew in the yards of the company at New Lisbon, Wis. He claims to have suffered injury while engaged in the performance of his duties by reason of the fact that certain freight car couplers did not couple automatically upon impact, requiring him to go between the cars to assist in making the coupling. His hand was caught in the coupler, resulting in a crushing of his hand and arm, necessitating the amputation of his right arm near the elbow. This suit was based upon alleged negligence of defendant in not furnishing proper couplers under the Safety Appliance Act and also negligence in the operation of the engine and cars. The latter charge was abandoned during the trial of the case.

At the close of the evidence defendant moved for an instructed verdict on the grounds, that plaintiff had failed to prove any defect in the couplers, that the evidence disclosed they were entirely operative, were capable of being coupled upon impact and uncoupled without the necessity of any one going between the cars, that plaintiff's act in going between the cars under the circumstances and conditions was the proximate cause of his injury.

The court overruled the motion and submitted the case to the jury, which returned a verdict for plaintiff for $13,500, for which judgment was duly entered. It should have sustained the motion if the testimony and inferences justifiably to be drawn therefrom furnished no substantial basis upon which a jury could find a verdict for plaintiff. Chicago, M. & St. P. R. Co. v. Coogan, 271 U. S. 472, 46 S. Ct. 564, 70 L. Ed. 1041.

In considering the motion to instruct a verdict it was the court's duty to ascribe to the evidence introduced by plaintiff, and the inferences to be drawn therefrom, the most favorable aspect the same would warrant. Waddell v. A. Guthrie & Co. (C. C. A. 10) 45 F.(2d) 977; South Carolina Asparagus G. Ass'n v. Southern R. Co. (C. C. A. 4) 46 F. (2d) 452; Engstrom v. De Witt (C. C. A. 8) 58 F.(2d) 137.

Was there such substantial evidence on the question of the condition of the coupler as to justify submitting the case to the jury?

Plaintiff testified at length. This testimony tends to show the following: Plaintiff had been employed by the defendant for some thirty years on its Wisconsin Valley division. The first four years he was a brakeman. Then he was promoted to passenger and freight conductor, and did some braking. He had worked subsequent to February 15, 1929, in the New Lisbon yards as switch foreman. At the time of the accident his hours of service were from 11 p. m. until 7 a. m. The switch crew, consisting of himself as foreman, the engineer, the fireman, and two switchmen, broke up passenger trains and freight trains in the yards and did the commercial switching therein. The switchmen and plaintiff performed coupling and uncoupling operations in the yard. Plaintiff would secure when he came to work at night a switch list, which was a list made up by the office force, showing the cars that were to be "spotted." The switching was done in accordance with the list, and plaintiff had general charge thereof as foreman of the crew. An engine was kept in the yards for the switching operations, and at night operations were by lantern signals.

At the trial, by plats and otherwise, the general situation of the New Lisbon yards was shown. It is unnecessary to go into particular detail concerning the arrangement of the tracks further than to say there was a track known as the Valley Main track, running east and west, and from this extending east up to the freight house was a house track which would hold about twelve 40-foot cars. The house track was the place of the accident. The passenger depot was east of the switch where the house track joined the Valley Main track. The night of the accident, May 8, 1932, after plaintiff had at 11 p. m. reported for work, he received at the passenger depot the messages and switching list having to do with the work of the crew that night. He then came out of the depot and was on the platform walking west when the yard engine with three cars of coal and a box car backing up toward the east on the Valley Main track went by him. He went back into the depot to find out about the box car, it not being on his list, and found it was a merchandise car for New Lisbon, which according to custom was to be placed on the house track about a car and a half west of the east end at a place called the "big space" or at the high platform at the extreme east end of the house track. When plaintiff came from the depot the second time he walked west, and at about the end of the depot platform the engine with the merchandise car alone passed him on the Valley Main track proceeding eastward toward the house track switch. One of the switchmen was on the rear board of the en-

gine. Plaintiff gave no order to the switchman as to where to put the car. As to this he testified on cross-examination: "As the engine went by me I did not tell the switchmen on the footboard where to put the car they had ahold of. I figured they knew where that car would go, on the house track at least. They had worked the night before. I thought they knew from the night before. I had not worked Saturday nights for several months. We do not always set cars going to the house track at the high platform. I figured they were going to set it on the Valley Main. I saw them do that. I knew they were then going to go in and couple the house track. That is not regular routine work, just like handling those coal cars. The switchmen knew it was a car for the house because Olson was acting foreman the night before. I knew the boys would couple all the cars, pull them out, couple to the merchandise car and push it in and spot it at the high platform, because I was going to see that they did. They had to pull all of the cars off the house track to put that car on the rear. That was a common thing."

There were four cars on the house track which were not coupled together. The most westerly car on the house track was just clear of the Valley Main track switch. The next car was east about a car length. The third car was about 15 to 20 feet east of the second car, and the fourth about 20 feet east of the third. To place the merchandise car in the proper place on the house track east of the fourth car it was necessary to leave it on the Valley Main track, go in on the house track, get the four cars there, pull them out on the Valley Main track, back up and couple to the merchandise car, then proceed westward until the switch for the house track was cleared, then back the cars east on the house track to where merchandise cars billed for New Lisbon were customarily placed. This involved a number of couplings to be made between the cars on the house track. When plaintiff came from the depot the second time and walked west and the engine with the merchandise car passed him he went from the platform to the north side of the house track between the third and fourth cars standing on that track. The knuckle on the west end of the fourth car was closed. He opened this he states by using the pin lifter lever. On cross-examination he leaves the inference that he may have opened the knuckle by hand. He opened this knuckle because he knew in carrying out the general plan the engine would back in with the other cars and get this car. He states it was customary to have such knuckles open,

so that, if there was to be a coupling, the car was on the track in the proper condition therefor. After opening this knuckle, he walked west on the north side of the house track to the west end of the third car. The engine was then on the west end of the house track coupling onto the first car. Switchman Olson, who seems to have acted as foreman when plaintiff was absent and who was known as the field man, was also on the north side of the track, which was the engineer's side. It was dark, and plaintiff and Olson both had lighted lanterns.

Another switchman, Dodd, was along by the side of the first or most westerly car. After the engine had coupled onto this car Olson gave the engineer a back up signal. The engine and the car then moved backward, or east, and the easterly end of car 1 came in contact with the westerly end of car 2, but did not couple.

On direct examination plaintiff testified:

"After the east end of Car 1 came in contact with the west end of Car 2 Olson gave the engineer another back up signal. At this time Olson was at the point where Cars 1 and 2 were to be coupled together and was about 60 feet west of me. At this time I was at the west end of Car 3. I watched to see that the coupling made between Cars 2 and 3. Before the two cars came back I did not give Olson any directions or instructions. I called to Olson and told him that we would take all of the cars off the house track and 'spot' the merchandise car at the high platform. At that time I was about 60 feet away from Olson. I had previously given him instructions when I was the same distance away from him.
* * *

"I gave Olson the information and instructions about where the merchandise car was to be placed before he gave the back up signals."

This evidence is not entirely clear as to instructions given Olson and when given.

On cross-examination plaintiff testified:

"After Cars 1 and 2 struck, I saw him give another back up signal which meant to move the whole string farther east. * * *

"On Olson's first signal to back up, they backed up and struck the second car. After they struck the second car, I saw the second back up signal. When Olson gave the first signal to back up, Car 1 and Car 2 did not couple. They backed up and hit Car 2 with Car 1. Car 2 went east some. Then Olson gave another signal to back up.

"I don't think Car 2 moved east after it

was hit the first time. I am not sure whether it did or not. Then I saw Olson give another signal which meant to back up east again. I don't think one signal brought Cars 2 and 3 together. There were two back up signals.

"I saw one back up signal and then heard Cars 1 and 2 come together. I don't know if the second car then moved east some. Then Olson gave another back up signal which meant to back east. That moved the second car farther east. It was Olson's business to give a back up movement to bring Cars 2 and 3 into contact. It was between Cars 2 and 3 that I was hurt. I saw the signal after Cars 1 and 2 came together and then saw another signal which naturally would put Cars 2 and 3 together. It was not all right for Olson to keep on with that switching movement because I gave a stop signal. I contend that Olson knew I was there and that he saw me. Olson did not answer my stop signal. If Olson did not know I was there it was all right for him to keep backing east but I contend he knew I was there."

We may here inject a reference to Olson's testimony that when cars 1 and 2 did not couple upon the first impact he repeated the back up signal almost immediately, and the engineer proceeded east until he caught up with car 2, struck it, and the coupling was made. Just after that Olson testifies he heard plaintiff call, and that he had not known of plaintiff's whereabouts previous thereto. Plaintiff was at the west end of car 3 when the engine and two cars were coming back. It was between cars 2 and 3 he was hurt. He testifies that before these movements he had examined the coupler on the east end of the third car, it being one of his duties to ascertain its position and that it was open. When cars 2 and 3 came together the couplers did not couple automatically. The cars came together at a speed of two to three miles an hour, which plaintiff states was about the speed the cars usually moved in effecting a coupling. He gave the usual and customary stop signal just before the cars struck. When the cars came together and did not couple they parted so that the couplers were about fifteen to eighteen inches apart. The impact moved car 3 fifteen to eighteen inches east. After the cars came to a stop plaintiff put his lantern in between the cars and saw that the knuckle on the third car was closed. This was the knuckle that he had seen to be open just before the impact. He did not then go in between the cars but put his lantern there. We quote from his testimony:

"When I found the knuckle or coupler closed I pulled the pin lifter lever which is on the outside of the edge of the car with my left hand. This lever can be operated from the side of the car without going in between the ends of the cars. I operated this pin lifter lever in the usual and customary manner. When I was operating this pin lifter lever my lantern was in between the ends of the cars. With my lantern between the cars I was able to watch, to see the knuckles, while I was operating the pin lifter lever. When I operated the pin lifter lever the knuckle did not open or move.

"Q. 'Well, then, after operating the pin lifter lever, and the knuckle did not open or did not move, what did you do to the knuckle, if anything?' A. 'I stepped in between the cars and opened the knuckle with my right hand.'

"In opening the knuckle with my right hand, I held the pin lifter up and reached in with my right hand and opened the knuckle. In order to go in there and do that I stepped in between the ends of the cars. The cars were standing still at the time I went in there."

When plaintiff was between the ends of the cars and opening the knuckle the engine and the two cars attached to it moved to the east and impacted the third car. The knuckle on the east end of the second car came in contact with the knuckle on the west end of the third car, and plaintiff's hand was caught in the couplers just as he pulled the knuckle open on the third car.

Plaintiff testified as to the different kinds of automatic couplers, that they were designed so that when cars came together they would couple automatically on impact, that when the couplers are in good working order and condition and either one or both are open and they come together on impact the coupling makes, that when a car is standing not coupled to another car and the pin lifter lever is properly operated, if the coupler is in good working order and condition, it will throw the knuckle open.

On cross-examination he testified with relation to his opening the knuckles on the fourth car prior to his walking west to the east end of the third car that the way to open the same is to lift the pin and pull the knuckle open with your hand, that it sometimes takes a lot of force to pull a knuckle open with a lever, but that he "had that force all right," that he was not in the habit of opening the knuckles with his hand unless they would not open otherwise. Further, he testified that he did not know if the coupler on the east end of the second car was open or closed, that he

figured the cars would couple if one knuckle was open, that he saw the knuckle was flat shut on the west end of the third car after the first impact and he saw that the coupler would not open when he tried to operate the lever.

Counsel for defendant asked the question: "Well, what is there about the movement that would not permit them to make?—That is the question." Answer: "The only answer I could give is that they are defective, or they will make."

Plaintiff testified on redirect examination that when he pulled on the pin lifter lever he did not step in between the ends of the cars before he saw that the knuckle did not swing open, and that he did not attempt to open the knuckle by hand until he saw it did not come open itself, and when cars come together upon impact and one of the cars is moved thereby fifteen or twenty inches it shows a movement of sufficient force to close the knuckle and cause the cars to couple together, that the cars need not be moved very far to bring about the coupling.

A witness for plaintiff was Jacob K. Thompson, who had been a switchman, switch foreman, and a freight conductor on defendant railroad for some two years and had had sixteen years of experience on other railroads, during which time he coupled and uncoupled cars. He testified that when cars are sought to be coupled by impact, if either knuckle is open or both knuckles are open and the couplers are in good working order, the cars will couple; that, if the knuckle is not defective or has nothing wrong with it, the couplers will open when the pin lifter lever is operated in the usual and customary manner; and that the couplers are so designed that, when they come in contact with each other, if one or both are open, the cars will couple automatically, if there is sufficient momentum.

Defendant introduced testimony of a number of employees as to experiments made shortly after the accident and later with the identical couplers involved therein. They testified that the couplers operated perfectly without men going between the cars to arrange the knuckles, and that there was no difficulty in opening the knuckles on the west end of car 3 with the pin lifter lever.

The principal witness for defendant was one Moran, who was supervisor in the car department of defendant at New Lisbon. He made an examination of the coupler on the car where plaintiff was hurt about thirty minutes after the accident, and he testifies the coupler worked all right. The next day he

removed all parts of the coupler, examined them, found them in good condition, no parts broken or displaced, replaced them, and again operated the knuckle. He testifies he had no trouble operating the same by the pin lifter, that the knuckle opened promptly with one pull, that it weighs some sixty-three pounds and requires considerable force to open it with the lift lever.

Defendant's witness, Hemsey, who experimented with the coupler, testified that he had to make two pulls of the lever to open the knuckle, but that it was perfectly natural to give two pulls on a coupler even when it was in good condition.

Defendant contends that these experiments demonstrated that the coupler in question was in perfect condition at the time of the accident and would function as intended.

Defendant also contends that the proximate cause of plaintiff's accident was his failure to use the appliance provided and his adoption of the easier and more dangerous method of opening the coupler by hand.

It is not disputed that the cars involved were being used in an interstate movement.

■ The Automatic Coupler Act is as follows: "It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." Chapter 1, § 2, title 45 USCA, Act March 2, 1893, c. 196, § 2, 27 Stat. 531.

It imposes upon railroads engaged in interstate commerce an absolute duty to equip cars used in such commerce with automatic couplers which at all times and under all circumstances, when operated in an ordinary, reasonable, and proper manner, will couple and uncouple without the necessity of men going between the ends of the cars. In Chicago, B. & Q. R. Co. v. United States, 220 U. S. 559, 575, 576, 31 S. Ct. 612, 616, 55 L. Ed. 582, with reference to the holding in the Taylor Case, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061, the court says: "It expressly decided that the provision in the 2d section relating to automatic couplers imposed an absolute duty on each corporation in every case to provide the required couplers on cars used in interstate traffic. It also decided that nonperformance of that duty could not be evaded or excused by proof that the corporation had used ordinary care in the selection of proper couplers or reasonable diligence in

using them and ascertaining their condition from time to time." In Louisville & Nashville Railroad Co. et al. v. Layton, 243 U. S. 617, 621, 37 S. Ct. 456, 457, 61 L. Ed. 931, the court said: "Carriers are liable to employees in damages whenever the failure to obey these Safety Appliance Laws is the proximate cause of injury to them when engaged in the discharge of duty." See, also, St. Louis, Iron Mountain & S. R. Co. v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061; Delk v. St. Louis & San Francisco R. Co., 220 U. S. 580, 31 S. Ct. 617, 55 L. Ed. 590; Great Northern R. Co. v. Otos, 239 U. S. 349, 36 S. Ct. 124, 60 L. Ed. 322; Minneapolis & St. Louis R. Co. v. Gotschall, 244 U. S. 66, 37 S. Ct. 598, 61 L. Ed. 995.

Of course the failure to obey the Safety Appliance Act must be the proximate cause of the injury to one seeking damage based on an alleged violation thereof.

To iron out a seeming lack of harmony as to the relation of the doctrine of proximate cause to injuries to employees claiming the protection of the act, as exhibited by St. L. & San Fran. R. Co. v. Conarty, 238 U. S. 243, 35 S. Ct. 785, 59 L. Ed. 1290, and Lang, Administratrix of Lang v. New York Cent. R. Co., 255 U. S. 455, 41 S. Ct. 381, 65 L. Ed. 729, on the one hand, and Louisville & Nashville R. Co. et al. v. Layton, 243 U. S. 617, 37 S. Ct. 456, 61 L. Ed. 931, and Minneapolis & St. Louis R. Co. v. Gotschall, 244 U. S. 66, 37 S. Ct. 598, 61 L. Ed. 995, on the other, the Supreme Court in Davis v. Wolfe, 263 U. S. 239, at page 243, 44 S. Ct. 64, 66, 68 L. Ed. 284, said: "The rule clearly deducible from these four cases is that, on the one hand, an employee cannot recover under the Safety Appliance Act if the failure to comply with its requirements is not a proximate cause of the accident which results in his injury, but merely creates an incidental condition or situation in which the accident, otherwise caused, results in such injury; and, on the other hand, he can recover if the failure to comply with the requirements of the Act is a proximate cause of the accident, resulting in injury to him while in the discharge of his duty, although not engaged in an operation in which the safety appliances are specifically designed to furnish him protection."

Plaintiff had general charge of these switching operations, and while Olson, who worked under him, had authority to give the signals for the movement of the cars, plaintiff had the right to assist in the coupling of cars 2 and 3, which was part of a general plan to couple all four cars upon the house track, and he was clearly engaged in the discharge of his duty in attempting so to do.

The preparation of the coupler for the impact is an indispensable part of the coupling operation, as pointed out by Judge (now Justice) Van Devanter in Chicago, M. & St. P. R. Co. v. Voelker (C. C. A.) 129 F. 522, 70 L. R. A. 264. It is clear the injury to plaintiff was the result of an attempted coupler operation.

If plaintiff failed to operate the coupler in a proper manner, the fact of its not working would be no evidence of defect. Just how much force may be necessary in operating the pin lever in order to bring about an opening of the knuckle cannot be definitely stated. There is no accurate measuring stick. One pull of the lever might be sufficient if enough force were put behind it, and there might be as much force exerted in one pull as in two or three. The question must be, Was there an earnest and honest endeavor to operate the coupler in an ordinary and reasonable manner, and was enough force applied to open the knuckle if the coupler was in proper condition? If under such circumstances the knuckle does not open and men are required to go between the cars to adjust the coupler and open the knuckle, the coupler does not meet the requirements of the act. A court cannot say that one pull upon the lever and failure of the same to respond, regardless of the force used or the manner of operation, is sufficient to show a defective coupler, nor can it say on the other hand that one pull can never be sufficient to show reasonable force. The trial court instructed the jury on this question as follows: "You will remember that there is testimony that the pin-lifting device required some force and a certain knack in order to manipulate it, and that often two jerks or pulls are required to open the knuckle in a good working coupler that will couple automatically upon impact. There is testimony that the mechanism to be moved in the coupler by the pin-lifting device weighs some sixty-three pounds. Now then, if Linehan failed to exert reasonable force or pull on this pin-lifting device, then, of course, failure of the device to operate is of no weight in proving a defective coupler. On the other hand, if he did apply reasonable force and customary force and the knuckle failed to open, necessitating opening the knuckle with his hands, you should give it such weight as it is entitled to in determining the ultimate question that you are called upon to decide, and that is, whether or not the defendant

equipped this car in question with couplers which would couple automatically upon impact, and which could be uncoupled without the necessity of men going between the ends of the cars." This seems to state the law clearly.

Since the passage of the Automatic Coupler Act in 1893 there has been a multitude of cases involving its construction where men have been injured by alleged defective couplers. We refer to a few as illustrative of the general trend of court decisions with reference thereto.

In Holz v. Chicago, M., St. P. & P. R. Co., 176 Minn. 575, 224 N. W. 241, 243, the court lays down the rule: "That a coupler which fails to work, when an honest and reasonable effort is made to operate it, does not comply with the act in question, and such failure to operate is sufficient evidence to justify the jury in finding it defective and in finding the carrier negligent."

In Popplar v. M., St. P. & S. S. M. R. Co., 121 Minn. 413, 141 N. W. 798, Ann. Cas. 1914D, 383, the operator, in attempting to lift a pin to open a coupler, jerked on it and pulled on it three or four times, but it would not uncouple. Another brakeman tried to lift the pin, but could not. This was held to be sufficient evidence to sustain a finding that the coupler was not such as required by law. This was affirmed by the Supreme Court, 237 U. S. 369, 35 S. Ct. 609, 59 L. Ed. 1000.

In Gotschall v. Minneapolis & St. L. R. Co., 125 Minn. 525, 147 N. W. 430, and the second time 130 Minn. 33, 153 N. W. 120, a witness testified that the couplers were brand new couplers, that he made no examination of one of them, that the one he examined was partly open, and that the cars will make a coupling generally if both knuckles are open. The court held that the question of defendant's negligence was for the jury. This case reached the Supreme Court of the United States, 244 U. S. 66, 37 S. Ct. 598, 599, 61 L. Ed. 995, and it was there affirmed. The court held that, while the general rule was "that negligence may not be inferred from the mere happening of an accident except under the most exceptional circumstances," such principle was not controlling, "in view of the positive duty imposed by the statute upon the railroad to furnish safe appliances for the coupling of cars."

In Meisenhelder v. Byran, 182 Minn. 615, 233 N. W. 849, 236 N. W. 195, the holding was that the evidence as a matter of law was insufficient to show that the coupler pin was defective. The evidence was that a coupler in which there were no mechanical defects and which operated properly both before and after the accident could not be found to be defective merely because a brakeman while riding on the moving car in a switching operation failed to lift the coupler pin by pressing on the pin lifter with his foot.

In Philadelphia & R. R. Co. v. Eisenhart (C. C. A. 3) 280 F. 271, a freight conductor was injured when couplers uncoupled and cars broke away and collided with the car on which he was riding. The court held that the mere opening of the couplers warranted submission of the question to the jury of whether they were defective in violation of the Safety Appliance Acts.

In Chicago I. & L. R. Co. v. Stierwalt, 87 Ind. App. 478, 153 N. E. 807, it was held that a car coupler may be defective within the Federal Safety Appliance Act (45 US CA § 1 et seq.) without being actually broken or containing visible defects. The court, discussing the argument that no defect was visible, and that therefore the coupler was not defective within the meaning of the statute, denied the contention. The injured man tried to open the coupler by means of the lifting lever. He first tried with one hand and then with both. Having failed, he stepped in front of a moving car and undertook to open the coupler with his hands, and while doing so was injured. Case held one for the jury.

In San Antonio & A. P. R. Co. v. Wagner, 241 U. S. 476, 36 S. Ct. 626, 60 L. Ed. 1110, the evidence showed that a coupling pin on a car failed to drop as it should have done on the first impact, requiring a manipulation in preparation for a second impact, and there was testimony of an experienced brakeman that, when the apparatus of automatic couplers is in proper condition and the couplers are properly connected, they couple by impact automatically. The court held the evidence was sufficient to sustain a finding that the coupler or couplers were insufficient, and did not measure up to the standard prescribed by the Safety Appliance Statute.

Chicago, R. I. & P. R. Co. v. Brown, 229 U. S. 317, 33 S. Ct. 840, 57 L. Ed. 1204, is an authority cited by defendant. It does not establish in any way, we think, that the mere fact that a pin would not lift when a brakeman or employee endeavored to lift it would in itself make a case of negligence. With reference to this, in San Antonio & A. P. R. Co. v. Wagner, supra, the court says at page

484 of 241 U. S., 36 S. Ct. 626, 629, 60 L. Ed. 1110: "We need not in this case determine, what was conceded in Chicago, R. I. & P. R. Co. v. Brown, 229 U. S. 317, 320, 33 S. Ct. 840, 57 L. Ed. 1204, 3 N. C. C. A. 826, that the failure of a coupler to work at any time sustains a charge that the act has been violated."

In Atchison, T. & S. F. R. Co. v. Keddy (C. C. A. 9) 28 F.(2d) 952, plaintiff testified that he tried to open the knuckle by the use of the pin lifter; that he jerked on the lever three or four times, but could not open it. He then took hold of it with his hand and tried to pull it open and his hand was caught between the drawbars. It was held the evidence was sufficient to sustain a verdict.

In Atlantic City R. Co. v. Parker, 242 U. S. 56, 59, 37 S. Ct. 69, 70, 61 L. Ed. 150, the court said: "If there was evidence that the railroad failed to furnish such 'couplers coupling automatically by impact' as the statute requires (Johnson v. Southern P. Co., 196 U. S. 1, 18, 19, 25 S. Ct. 158, 49 L. Ed. 363, 369, 370, 17 Am. Neg. Rep. 412), nothing else needs to be considered. We are of opinion that there was enough evidence to go to the jury upon that point. No doubt there are arguments that the jury should have decided the other way. * * * If couplers failed to couple automatically upon a straight track, it at least may be said that a jury would be warranted in finding that a lateral play so great as to prevent coupling was not needed, and that, in the absence of any explanation believed by them, the failure indicated that the railroad had not fully complied with the law."

Two cases in this court are cited and urged as authority for defendant's position. One is Union Pac. R. Co. v. Brady (C. C. A. 8) 161 F. 719, where an employee jerked the lever to pull the pin two or three times. This court said there was no substantial evidence of defect. This case was in 1908, long before the Supreme Court had given the broad and humanitarian interpretation to the Safety Appliance Acts which it has now given, and it is difficult to find any citation of this case or reference thereto in the subsequent decisions. The other is Midland Valley R. Co. v. Fulgham, Administrator (C. C. A. 8) 181 F. 91. There this court held the evidence was not sufficient to take the case to the jury. It held the conclusion of the jury that the coupler was defective was a mere conjecture, that there was no evidence of any such defect, that the legal presumption that a lawful coupler had been furnished was not overcome, that the presumption was sustained by the evidence of all the witnesses who examined the coupling apparatus. An employee named Pogue was killed. He stepped between the cars to adjust in some way the couplers. The court says at page 95 of 181 F.: "He [referring to plaintiff] proved that Pogue stepped between the cars and was killed, but he produced no evidence that the lift pin lever did not open the coupler when Pogue jerked it, or that the lever or the coupler were in any way defective or inoperative." The case in this respect differs from the case at bar, although it is something of an authority for defendant's contention.

■ Defendant urges that the physical facts contradict the testimony of plaintiff. It is undoubtedly the law that, if the physical facts positively contradict the testimony of a witness, that testimony is not to be credited by a court or jury. Missouri, K. & T. R. Co. v. Collier (C. C. A. 8) 157 F. 347; American Car & Foundry Co. v. Kindermann (C. C. A. 8) 216 F. 499; F. W. Woolworth Co. v. Davis (C. C. A. 10) 41 F.(2d) 342.

■ Evidence which cannot possibly be true is not substantial evidence. It seems to be assumed by defendant that, because a number of its employees have testified that the coupler worked perfectly soon after the accident, and that the experiments made by them show the knuckle opened readily by the use of the pin lifter lever, a bar of physical facts was erected against plaintiff's testimony. That is to say, that the jury were required to believe defendant's witnesses, but the jury are the judges of the credibility of the witnesses, and the weight of the evidence, and may not have believed defendant's witnesses. It is not for us to say what witnesses the jury must believe. It is evident the jury believed plaintiff. How we might have regarded the matter were we jurymen is immaterial. Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co. (C. C. A. 8) 64 F.(2d) 834.

In Davis v. M. & St. L. R. Co., 134 Minn. 369, 159 N. W. 802, a situation under the Federal Safety Appliance Act was presented, and the question of physical facts demonstrating the testimony of witnesses to be untrue was discussed. Three witnesses there examined the coupler in question within thirty minutes after the accident, as was done here. They declared no defect could be detected in any of its parts, that it operated properly when the lever was pressed. It was argued, as here, that this evidence showed the coupler to be in good condition and workable, and that showing the same within such

a short time after the accident conclusively established there was no violation of the Safety Appliance Act. The court held the jury should not be precluded from passing upon the truthfulness and effect of the testimony of these witnesses. Plaintiff testified that he made several futile attempts to work the lever, but was unable to lift the coupling pin, and so went in to lift it by hand. The court held that, notwithstanding the evidence of the witnesses as to the experiments made thereafter, the entire evidence made the question presented as to whether the car plaintiff attempted to uncouple was properly equipped a jury question.

■ Plaintiff seems to have paid little, if any, attention to the condition of the coupler on the west end of the second car. His evidence is positive that the coupler on the east end of the third car was open prior to the first impact. Under the undisputed evidence a coupling would be made by a strong impact if one of the knuckles was open. Probably it would require greater force than if both knuckles were open. If it was necessary that both knuckles be open to make the coupling, then it is a fair inference from the record that the knuckle on the east end of car 2 was open, as when the plaintiff opened the knuckle on the west end of car 3 the coupling was made. That the coupling might have been made if both knuckles were open, and that it was in fact later so made, would not relieve the defendant from liability under the statute, if, in order to place the knuckles in that position, it was necessary to go between the cars. Hurley v. Illinois C. R. Co., 133 Minn. 101, 157 N. W. 1005.

■ Upon the evidence introduced by defendant a strong argument can be made, as has been here, that the coupler in question was not defective, and that plaintiff did not operate the lever in an efficient manner. However, it is not for us to pass on the merits of the case as developed by the evidence. That is for the jury. We are concerned only with the question as to whether there was such substantial evidence as to warrant the trial court in submitting the case to the jury. It seems to us that we would not be warranted in holding that there was no substantial evidence here in support of plaintiff's contention that his injuries resulted from a coupler that failed to comply with the law. We would have to pass by the circumstance of the cars failing to couple upon the first impact, the evidence of plaintiff, a trusted and efficient employee, with long experience in the operation of couplers, that he attempted in the usual and customary way to pull the pin lifter on car 3, and that the knuckle would not open, he knowing the amount of force necessary to use, and that it sometimes took great force to pull a knuckle open with the lever, but, as he testified in relation to the knuckle on the fourth car, "I had that force all right," the evidence of Thompson that the knuckles on these couplers, if there is no defect, will open when the pin lifter lever is operated in the usual and customary manner. This we cannot do.

The judgment is affirmed.